## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Case No.** |
| **vs.** | |
| **ASHRAF MUFAREH AND ONPASSIVE LLC a/k/a Gofounders and Ofounders,** | |
| **Defendants, and** | |
| **ASMAHAN MUFAREH** | |
| **Relief Defendant.** | |

## COMPLAINT FOR PERMANENT INJUNCTIVE
## AND OTHER RELIEF AND DEMAND FOR A JURY TRIAL

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") for its complaint against Ashraf "Ash" Mufareh ("Mufareh"), ONPASSIVE LLC ("ONPASSIVE" or the "Company") (collectively "Defendants"), and Relief Defendant Asmahan Mufareh alleges as follows:

## SUMMARY

1.      This enforcement action arises out of defendant Mufareh's fraudulent and unregistered offering of securities targeting investors in the United States and

around the world through his multi-level marketing ("MLM") company, ONPASSIVE LLC.

2.    Beginning in July 2018 to the present (the "Relevant Period"), Mufareh in his individual capacity and later through ONPASSIVE, claimed to be developing a suite of computer applications using artificial intelligence ("AI") that would seamlessly interface with one another in an "ecosystem" similar to applications offered by established, well-known multinational technology companies.

3.    Ostensibly, to finance the development of the applications and the creation of the ecosystem, from inception through June 22, 2022, Mufareh and ONPASSIVE, pitched potential investors on the opportunity to buy a position in an MLM pyramid structure created by Mufareh for $97, locking in their positions before any launch of the purported product and before others began buying into the scheme in the future.  Investors taking advantage of this "early bird" promotion—called "Founders"—were assured a higher placement in the pyramid, and higher returns, than later investors waiting to buy into the scheme by making a product purchase and commencing payment of a monthly subscription after product launch.

4.    In addition to this early bird Founders promotion, potential investors were pitched on the notion that once the product was actually launched for

commercial sale they and others would eventually be able make a one-time initial payment to purchase a purported product package and then also pay a monthly subscription fee to use the purported applications.  Investors making this payment would automatically be placed in a pyramid structure and eligible to receive as a "commission" a portion of monthly subscription fees paid by those placed after them in the pyramid structure.

5.      As the name "ONPASSIVE" implies, Mufareh and ONPASSIVE promoted the scheme as a "passive" income opportunity by emphasizing that investors did not have to do anything, other than make a one-time purchase of product and pay monthly subscription fees and, in the case of Founders, the $97 fee, to receive commissions.

6.      Defendants represented that they would engage in a marketing campaign —once they launched ONPASSIVE's purported suite of computer applications—to recruit other participants and direct the traffic to websites ONPASSIVE created for each Founder and participant joining post-launch using an automated process.

7.      Mufareh and ONPASSIVE also incentivized persons to recruit as many other participants as possible through an MLM structure, claiming a participant's recruits would be placed under the participant and be sources of commissions paid to the participant.

8.     Further, Mufareh and ONPASSIVE incentivized participants to purchase multiple $97 positions in the pyramid to maximize the number of passive income streams.  There was no reason an individual would purchase multiple positions other than to increase the individual's potential for income.

9.     The offer and sale of the opportunity to participate in ONPASSIVE, which is a pyramid scheme, involves investments of money in a common enterprise with an expectation of profits to come from the efforts of others.  As such the ONPASSIVE opportunity is an investment contract and, therefore, a security.  The offering and sale of the ONPASSIVE opportunity has never been registered with the SEC and no exemption from registration applies.

10.     To further their fraudulent pyramid scheme, Mufareh and ONPASSIVE knowingly made repeated material false and misleading statements and omissions concerning, among other things: the timing of product launch, which would trigger commission payments; the potential income to be earned; and the soundness and legality of their operations.

11.     Further, to counter negative reviews of Mufareh and ONPASSIVE on existing MLM review websites, Mufareh and ONPASSIVE furtively created websites mimicking the names of the existing sites and on which ONPASSIVE personnel, at Mufareh's direction, then posted internally-generated positive

reviews of Mufareh and ONPASSIVE, falsely passing them off as objective, third-party reviews.

12.     Effective June 22, 2022, ONPASSIVE ceased accepting any more Founder registrations.

13.     As of March 2023, ONPASSIVE had reaped over $108 million from the purchase of over 1.12 million Founders positions by over 800,000 investors located in the United States and abroad, and who paid $97 for each position in the pyramid scheme in advance of the supposed product launch.

14.     Having chiefly focused on recruiting investors rather than the development of the purported AI applications, Mufareh and ONPASSIVE continuously delayed any "launch" of the purported AI applications while claiming that they were being developed.

15.     As of June 30, 2023, ONPASSIVE had not yet launched any product for a fee or paid any commissions to investors.

16.     Rather than commit investor proceeds principally to develop and commercialize the purported software applications, Mufareh has used funds to further the pyramid scheme and for his and his spouse's personal use.  Specifically, Mufareh transferred investors' funds to his wife, Asmahan Mufareh, including transfers into bank account or accounts held jointly by the Mufarehs or held in Asmahan Mufareh's name only, or over which Asmahan Mufareh exercised

authority.  In addition, the Mufarehs converted a considerable portion of investor funds into crypto assets under their exclusive personal control. The Mufarehs then used funds from these accounts for personal expenses, including online retail purchases, upscale dining, TV subscriptions, groceries, salon and spa visits, and the purchase of stocks.  Asmahan Mufareh does not have a legitimate claim to the funds transferred from ONPASSIVE or Ashraf Mufareh.

## **VIOLATIONS**

17.     By their conduct as alleged in this Complaint, Defendants each violated the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)] and the antifraud provisions of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section l0(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule l0b-5 [17 C.F.R. § 240.l0b-5] thereunder.

18.     Moreover, by his conduct as alleged in this Complaint, Defendant Mufareh had the power to control the general affairs of ONPASSIVE at the time ONPASSIVE violated the securities laws as alleged herein, and Mufareh directly or indirectly possessed the power to direct or cause the direction of the management and policies of ONPASSIVE, and, therefore, Mufareh is liable jointly and severally with and to the same extent as ONPASSIVE for its violation of Section l0(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule l0b-5 [17 C.F.R. §

6

240.l0b-5] thereunder, pursuant to Exchange Act Section 20(a) [15 U.S.C. §

78t(a)].

19.     Unless Defendants are restrained and enjoined, they are reasonably

likely to continue to engage in the acts, practices, transactions, and courses of

business set forth in this Complaint or in acts, practices, transactions, and courses

of business of similar types and objects.

## DEFENDANTS

20.     **Ashraf "Ash" Mufareh**, age 48, is a resident of Orlando, Florida.  He

is the co-founder and co-owner with his spouse, Asmahan Mufareh, of

ONPASSIVE and, throughout the Relevant Period, has been its Chief Executive

Officer.  Throughout the Relevant Period, he has wholly controlled all operations

of ONPASSIVE and had ultimate authority over its activities, including the

violative conduct at issue here.

21.     **ONPASSIVE a/k/a Gofounders and Ofounders**, was established as

a Florida LLC on November 19, 2018, before being converted to a Delaware LLC

on September 23, 2021.  ONPASSIVE has maintained an office in Orlando,

Florida, since 2018.  At no time did the company have a category of securities

registered with the SEC.  The names "ONPASSIVE," "Gofounders" and

"Ofounders" have been used interchangeably to describe the company that has

purportedly been developing AI applications, and also to describe the Company's

7

MLM program.  All acts and omissions of ONPASSIVE as alleged herein were done at Mufareh's direction.

### RELIEF DEFENDANT

22.    **Asmahan Mufareh**, age 38, is a resident of Orlando, Florida.  She is Mufareh's spouse and the co-founder and co-owner of ONPASSIVE, and she has received securities fraud proceeds to which she has no legitimate claim.

### TERMS

23.    "**Founders**"  These are investors who registered on ONPASSIVE's Back Office prior to product sales occurring (or "pre-launch") for the opportunity to be placed in a pyramid structure and ultimately eligible to receive as a "commission" a portion of monthly subscription fees paid by those placed after them in the pyramid structure.  ONPASSIVE placed each Founder in the pyramid pre-launch in the order in which they registered.  The Defendants, however, did distinguish between Founders that paid the $97 pre-launch versus those that have not yet paid. The Defendants referred to Founders who have not yet paid as holding "free" positions.  The Defendants can remove any Founder holding a "free" position at any time prior to product launch and indicated that they would eliminate all such "free" positions prior to product launch so that only paying Founders would be eligible to maintain their positions in the pyramid and elect to be a "Reseller."

24.     "**Reseller**" In order to receive commissions an investor (whether they be a Founder who registers pre-launch or someone who invests post-launch) also had to sign up on ONPASSIVE's Back Office to be a "Reseller."  An e-Book posted to ONPASSIVE's Back Office from December 2021 into August 2022 stated that every Founder would elect to become a "Reseller."  According to ONPASSIVE, once having made the election to be a "Reseller," the person was not required to do anything further.  Rather, ONPASSIVE stated that it would create a website for each Reseller and that upon product launch ONPASSIVE would then engage in a marketing campaign to attract other potential investors or users of the purported product through the Reseller's website using artificial intelligence.  ONPASSIVE said it would treat each purported product purchase made through a Reseller's website as a "resale."  A portion of the monthly subscription fees paid by customers routed to each Reseller's website would then be paid as a "commission" to the Reseller.  These resale commissions would be in addition to the commissions paid out of monthly subscription fees paid to each Founder by the Founders beneath them in the pyramid.

25.     "**Leadership Council**"  This refers to a group of highly productive and enthusiastic Founders selected by Mufareh to promote ONPASSIVE.

26.    "**Back Office**"  This refers to ONPASSIVE's non-public website accessible by the over 800,000 investors who registered as "Founders," or were granted access by Mufareh.

27.    "**e-Book**" This refers to a digital composition, of which there were successive iterations, reviewed and edited by Mufareh and then posted to ONPASSIVE's Back Office with Mufareh's authorization, containing information concerning  ONPASSIVE's MLM program.

## JURISDICTION AND VENUE

28.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d)(1), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(e) and 78aa(a)].

29.    The Court has personal jurisdiction over Defendants and venue is proper in the Middle District of Florida, pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this District. Defendants offered and sold securities at issue in this District, and individuals who reside in this District are among those who invested $97 to Defendants to be Founders.  Furthermore, Defendant Mufareh and Relief Defendant Asmahan

10

Mufareh reside in this District, and ONPASSIVE's principal place of business is in this District.

30.     The investments, offered, purchased, and sold as alleged herein were securities as defined under the Securities Act and the Exchange Act.  In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange—namely, through Defendants' use of the internet, including for email, the transmittal of live webinars and of the same webinars and informational e-Books posted to ONPASSIVE's Back Office.

## FACTS

## I.   THE ONPASSIVE PYRAMID SCHEME

### A.     The ONPASSIVE Multi-Level Marketing Program

31.     In July 2018, Mufareh, and ONPASSIVE, following its formation in November 2018, began soliciting investors to ONPASSIVE which they pitched as a legitimate MLM program, the shared profits of which would purportedly come from monthly subscription fees to use online software applications, which ONPASSIVE has yet to fully develop and make available commercially.

32.     Defendants solicited investors, using email and live webinars, usually produced from Mufareh's Orlando home, which were recorded and then posted to ONPASSIVE's Back Office for later viewing.  ONPASSIVE's Back Office contained informational e-Books which Mufareh reviewed, edited, and authorized to have posted.  Anyone registering as a Founder or granted access by Mufareh could access ONPASSIVE's Back Office.  Founders who actively promoted ONPASSIVE, particularly those comprising ONPASSIVE's so-called "Leadership Council," also disseminated promotional materials on the public internet as part of their recruitment efforts, which Mufareh and ONPASSIVE incentivized them to do by representing that each Founder recruited by an existing Founder would be placed under the existing Founder in the pyramid.

33.     ONPASSIVE's promotional materials conveyed that monies raised would be used for product development.  The purported product would be a suite of computer applications using AI to automate marketing functions for online businesses.  In February 2020, Mufareh announced in a webinar posted to ONPASSIVE's Back Office that the target audience was being expanded to include anyone interested in using AI applications.  Between August 2019 and at least December 2021, the number of computer applications the Defendants claimed they would launch increased from approximately 20 to over 50.

34.     During the Relevant Period, Defendants publicly stated that they would employ a "Software as a Service" model where, rather than owning the products outright, customers[1] would purchase a product package and then pay a monthly subscription fee to use the products.

35.     Investors could purchase placement in the MLM pyramid in one of two ways: first, by paying $97 in advance of the product launch; and, second, by waiting to purchase a software product on or after product launch.  Under either option, each investor would be placed in the pyramid in the order in which each registered.  "Founders" as a category of early investors were assured of being placed more highly than those registering on or after product launch.  Investors would maintain their respective positions at or after product launch provided they made all required payments.

36.     A visual depiction of the MLM opportunity, often used in promotional materials posted to ONPASSIVE's Back Office and the public internet during the Relevant Period, advertised the pyramid incentive structure as follows:

---

[1] The term "customer" as used herein refers generally to any individual who would, under ONPASSIVE's envisioned plan, purchase the purported software product.  A customer might also be a Founder or otherwise participate in the MLM post-launch but not necessarily so.  At least as of June 30, 2023, ONPASSIVE had yet to sell any products, and had no paying customers as of that date.



37.     Defendants generally indicated that the pyramid under each recruit would be limited to ten rows with the number of positions in each successive row increasing by a multiple of three, for a maximum of 88,523 positions all told, although Defendants also occasionally indicated that the number of rows could be unlimited.  Defendants further indicated that the "spillover" concept applied, meaning that an investor who actively recruits others into the scheme could fill in vacant pyramid positions anywhere below the active investor in the pyramid to include positions below investors who were not actively recruiting.

38.     According to Defendants' promotional materials and communications with Founders, to maintain one's position in the MLM pyramid at the time of product launch, a Founder has to have paid the $97 Founder's fee, purchased a

14

product package, and paid a monthly subscription fee in order to continue to receive commissions.  The monthly subscription fee was initially specified as $25-$900, depending on the product package the participant purchased.  Investors were told in a video posted to the Back Office that the $97 Founder's fee would cover the first year of post-launch monthly subscription fees in their entirety.  Those who were not Founders would need to purchase product packages after launch to be placed in the pyramid and pay a monthly subscription fee to maintain a position in the pyramid and receive commissions.

39.     From inception, Defendants claimed that ONPASSIVE would begin paying commissions upon product launch, when it began collecting monthly subscription fees.

40.     Defendants permitted investors to register as Founders pre-launch while deferring payment to a later date, provided payment was made prior to product launch.  Failure to pay the Founder's fee in advance of launch would result in forfeiture of the so-called "free" position in the pyramid.

41.     By December 2021, Defendants had modified the MLM program participation requirements in three respects.  First, the monthly subscription fees would no longer be in the range of $25-$900, but substantially higher although unspecified amounts.  Second, a Founder's $97 initial payment would no longer be deemed to cover the monthly subscription fees due during the first year following

product launch. Founders would now have to pay a monthly subscription fee on product launch. Finally, in addition to purchasing a product and commencing payment of monthly subscription fees at product launch, in order to receive commissions, an investor—whether a Founder or individual joining post-launch—would also now have to elect to be a "Reseller." Electing to be a Reseller meant simply checking a box on ONPASSIVE's website. The election could be made at any time at or after product purchase, although ONPASSIVE's e-Book posted to the Back Office from December 2021 into August 2022 asserted that every Founder would elect to be a Reseller. There was no added cost for electing to be a "Reseller," and electing to be a "Reseller" did not obligate the electing person to do anything.

42.     At no time up through June 22, 2022, was a limit placed on the number of Founder positions that an investor could purchase. Since a single Founder's position would enable the investor to purchase product, the only reason for purchasing more than one Founder's position was to secure multiple passive income streams.

43.     Although ONPASSIVE claimed that it ceased accepting Founder registrations effective June 22, 2022, Defendants have afforded those Founders holding "free" positions as of that date to pay the $97 Founder's fee after that date,

resulting in the payment of tens of millions of dollars in Founders' fees in the ensuing period.

**B.   Defendants Promoted the Plan, Emphasizing the Passive Income Opportunity through Recruitment**

44.     Throughout the Relevant Period, Defendants made clear how much an investor would receive in commissions was directly tied to how high in the pyramid the investor was placed relative to others, which, in turn, was a function of how many participants were recruited under them and in succeeding levels of the MLM pyramid.  Only a Founder could recruit other Founders, who would then be placed under and be sources of commissions for the recruiting Founder.

45.     The Defendants represented that on product launch, ONPASSIVE would engage in an intensive marketing program to attract new customers and, using an automated system, direct traffic to websites that they would create for each Reseller (a Founder or investor who joins post-launch).  Individuals directed to a Reseller's website who then purchased a product, would be deemed a recruit of the Reseller.  ONPASSIVE tracked Founders recruited by other Founders and undertook to track recruits post-launch.  Accordingly, Defendants made recruitment of more Founders and/or Resellers a focal point of their MLM program from inception.

46.     Defendants also incentivized investors to join as early as possible by emphasizing that the earlier interested parties joined, the more highly placed they

17

would be in the pyramid relative to later joining participants, and the more they could earn in passive income from those placed under them.

47.     Although Defendants emphasized that participants could maximize their passive income by recruiting others, Defendants also told investors—whether Founders or those considering joining later—that they could earn passive income without engaging in any recruiting activity, but instead relying entirely on ONPASSIVE's efforts to market the MLM opportunity and, post-launch, place recruits ONPASSIVE solicited directly under existing participants in the pyramid structure.

48.     While Defendants initially pitched the yet-to-be-released suite of applications to be for business owners looking to create an online presence to market their services or products, they also repeatedly told investors that they did not need to have an already existing business.  Rather, investors could use the product post-launch to market the ONPASSIVE program (and, implicitly, the passive income making opportunity), thereby populating the pyramid under them with new recruits to maximize their own passive income stream.  Thus, no business use for the product was needed beyond recruiting for ONPASSIVE, and the investors' profits would come from the recruitment of others into the scheme rather than from product sales to bona fide retail purchasers.

49.     The most heavily marketed aspect of the fraudulent scheme to incentivize investors was not the potential or value of the purported software application product, but rather the potential size of the income opportunity, about which Defendants have made multiple and repeated misleading claims.

50.     For example, Defendants advertised in promotional materials and live and recorded webinars posted to the Back Office outlandish potential passive or "residual" returns to investors that could last "for life."  The payment grid below, which appeared in ONPASSIVE e-Books and webinars posted to ONPASSIVE's Back Office at least up through late 2020, purports to show how a participant could receive up to $2,032,614 per month for life.  This number is based on the unrealistic assumption that ten levels of recruits, comprising 88,573 commission-generating positions of persons buying in at varying levels, would populate the pyramid under the participant.

| Levels | Members | $25 | $125 | $250 | $500 | Totals | Running |
|---|---|---|---|---|---|---|---|
| 1 | 3 | $6 | $30 | $30 | $60 | $126 | $126 |
| 2 | 9 | $27 | $135 | $225 | $270 | $657 | $783 |
| 3 | 27 | $54 | $189 | $270 | $405 | $918 | $1,701 |
| 4 | 81 | $81 | $405 | $648 | $1,215 | $2,349 | $4,050 |
| 5 | 243 | $243 | $1,215 | $1,944 | $3,645 | $7,047 | $11,097 |
| 6 | 729 | $729 | $2,187 | $5,832 | $7,920 | $16,038 | $27,135 |
| 7 | 2,187 | $2,187 | $4,374 | $15,309 | $21,870 | $43,740 | $70,875 |
| 8 | 6,561 | $6,561 | $19,683 | $45,927 | $98,415 | $170,586 | $241,461 |
| 9 | 19,683 | $19,683 | $59,049 | $157,464 | $295,245 | $551,124 | $792,585 |
| 10 | 59,049 | $59,049 | $118,098 | $472,392 | $590,490 | $1,240,029 | $2,032,614 |
| Total | | $108,303 | $205,365 | $700,041 | $1,018,915 | $2,032,614 | $2,032,614 |

**Disclaimer: Earnings vary depending on each individual affiliate's effort. The income claims presented are not intended to serve as a guarantee of income; instead they're designed to give you an idea of what's possible. As with any business, success with ONPASSIVE requires hard work, commitment, leadership and desire.

51.     Illustrative of how Defendants used this payment grid is a webinar the Defendants broadcast on September 25, 2018, and then posted to the Company's Back Office website.  In the webinar, Mufareh stated that the grid showed how it was possible for participants to receive over $2 million per month if up to ten tiers under them were fully populated and suggested that $30 million per month was feasible if more than ten rows were populated.

52.     An e-Book reviewed and edited by Mufareh and posted to ONPASSIVE's Back Office with Mufareh's authorization from December 2021 to

August 2022 claimed that a participant could have "an infinite team" of downstream recruits from which the participant would draw commissions and earn "unlimited residual income" "for life."  Elsewhere the same e-Book stated that a participant could earn thousands and even millions of dollars.

### C.   ONPASSIVE Is A Pyramid Scheme

53.     ONPASSIVE is a pyramid scheme.  As described above, ONPASSIVE offers investors in return for their payment of money the right to promote and sell ONPASSIVE's purported product and receive income not for the sale of the product to ultimate users, but rather in return for recruiting other participant-recruiters (investors).  These investors in turn are likewise incentivized to recruit still other investors in an unending and unsustainable chain of recruitment.  ONPASSIVE incentivized recruitment structure has no method or procedures in place to ensure that a substantial portion of sales are to bona fide retail users of the product.

54.     To earn commissions, an investor must purchase product and commence paying monthly subscription fees, with those paying the $97 Founder's fee assured a higher place in the pyramid structure, relative to those who do not, so as to maximize their passive income streams.  Other than making payments and checking a box electing to be a "Reseller," no further action by an investor is required to receive a passive income stream.

55.     The purported income opportunity has driven recruitment rather than the utility of the product.  This is evident from, among other things, Defendants' successful solicitation of over 800,000 investors worldwide to purchase over 1.12 million Founders positions over the course of four years, during which time Defendants never commercially launched a single product and devoted their communications chiefly to describing the income opportunity.  Of these over 800,000 investors, over 93,000 (nearly 12%) purchased multiple Founders positions.  Given that each investor could purchase all the product the investor desired through one position, the purchase by over 93,000 investors of multiple Founders positions confirms that receipt of passive income is a driver of investor interest.  Meanwhile details on the products under development remain scant.

56.     Most ONPASSIVE investors are bound to lose money.  For example, to fully populate ten more levels of the pyramid beyond the ten levels depicted in paragraph 50 above would require 5.2 billion positions, assuming the number of positions in each successive tier increases by a factor of three.  It is not possible to have an infinite team of participants from whom an investor could earn unlimited residual income for life, as claimed in the e-Book referenced in paragraph 52 above.

57.     A reasonable investor would have wanted to know that ONPASSIVE was a pyramid scheme.

22

58.     A reasonable investor would have wanted to know that ONPASSIVE was unsustainable and could never deliver on the "passive" or "residual" income Murfareh and ONPASSIVE promoted to investors.

59.     Throughout the Relevant Period, Mufareh has known or been reckless in not knowing that ONPASSIVE is a pyramid scheme that has operated and continues to operate as a fraud or deceit on investors.  As CEO, co-owner, and the ultimate authority over all ONPASSIVE operations and statements, Mufareh's scienter is imputable to ONPASSIVE.

## II.    DEFENDANTS MADE MATERIAL MISREPRESENTATIONS IN FURTHERANCE OF THE ILLEGAL ONPASSIVE SCHEME

60.     In addition to operating a pyramid scheme, in furtherance of the scheme, Defendants made materially false and misleading statements or omitted information which made those statements which were made materially misleading.

### A.    Defendants Fraudulently Misrepresented that ONPASSIVE was "Legal" and "Fully Compliant"

61.     During the Relevant Period, Defendants misrepresented to investors that ONPASSIVE was engaged in a legal business:

a.     Mufareh stated this expressly in webinars dated September 25, 2018, July 18, 2019, and June 11, 2020, which were posted to the Back Office.  In a webinar dated August 29, 2019, Mufareh falsely declared that ONPASSIVE was

"legal" in every country in which it operated, or there would be "workarounds" to make it legal.

> b.      E-books, which Mufareh reviewed, edited, and authorized for posting to ONPASSIVE's Back Office in April 2019 and again in December 2021, stated "WE ARE FULLY LEGAL-WORLDWIDE"; "WE ARE FULLY COMPLIANT-WORLDWIDE"; and "WE WILL NOT be shut down by a government; THEY WILL USE OUR PRODUCTS!"

62.     The foregoing misrepresentations were material because a reasonable investor would want to know if an investment opportunity was illegal in deciding whether to invest.

63.     Mufareh knew or was reckless in not knowing that the foregoing statements were materially false and misleading.  His whole course of dealings, as alleged in this complaint, reflect his awareness that ONPASSIVE is an illegal pyramid scheme.  His scienter is imputable to ONPASSIVE.

## B.    Defendants Fraudulently Misrepresented the Feasibility and Timing of Product Launch

64.     Mufareh, beginning in July 2018, and ONPASSIVE, following its formation in November 2018, made material misstatements up through at least October 2020 regarding the feasibility and timing of the product launch, including the following:

a.     Beginning on July 17, 2018 and continuing through at least October 2018, Mufareh composed and sent, or directed others to send, hundreds of emails to potential investors containing the text "I [Mufareh] will send an update when the program launches in about one month**.**"

b.     On September 25, 2018, Mufareh said in a live webinar, a recording of which was posted to ONPASSIVE's Back Office, "We're closer to launch, we're in the second half, maybe the last third, and you do the math … I don't have a date, I'm going to touch up on that respectfully, is it realistic to launch in the next 30 days?  Very much possible I would say okay."

c.     On October 3, 2018, Mufareh said in a live webinar, a recording of which was posted to ONPASSIVE's Back Office, "We are definitely closer to the launch than when we announced this concept let's say in the past, so we're clearly in the probably last third or quarter maybe."

d.     In a webinar dated April 25, 2019, a recording of which was posted to ONPASSIVE's Back Office, Mufareh represented that ONPASSIVE would be launched or nearly ready to launch by the end of June 2019 (then two months away), saying, "In June we will have a kick start party in Orlando.  Last weekend of June.  Celebrate launch or opening whether it's already open or getting tested just ready to launch."

e.     In a webinar dated March 26, 2020 and posted to ONPASSIVE's Back Office, Mufareh stated that "ONPASSIVE is going to launch … it is everything looking good for 2020."

f.     On August 6, 2020, Mufareh stated in a webinar, a recording of which was posted on ONPASSIVE's Back Office, that, "ONPASSIVE is scheduled and set to launch in 2020... 2020....  If we need more time we will let you know right now.  We don't feel there's any uh necessary time to launch....  We have plenty of time for the remaining portion of unfinished part of ONPASSIVE to complete it in 2020."

g.     Mufareh thereafter reviewed six emails drafted by members of ONPASSIVE's Leadership Council which reiterated Mufareh's August 6, 2020, pronouncement that there would be a 2020 launch date, and which were transmitted via ONPASSIVE's official email address to prospective and existing investors on various dates from August 31 through October 31, 2020.

h.     In a webinar dated October 15, 2020 and posted to ONPASSIVE's Back Office, Mufareh stated that all that was left was "realistically a few weeks" of testing, saying, "If now we are considered in pre-launch – how much more launch you want – like okay just that ribbon cutting?  It will happen.  It's a done deal in my mind, that's why I operate as we already have a multi-billion dollar business in every country on the planet."

26

65.     Each of the foregoing statements was false when made because, first, Defendants did not have the personnel to develop the applications along the time lines indicated above; and, second, to the extent Defendants hired personnel and expended resources, at least up through August 2020, it was chiefly to develop ONPASSIVE's Back Office website used for recruiting new investors, tracking placement in the MLM pyramid structure, and marketing the ONPASSIVE income opportunity.

66.     For example, in July 2018, when Mufareh started making, directly or indirectly, the first of the statements referenced above that the "program [would] launch[] in about one month," Mufareh and Asmahan Mufareh were the only two persons involved with any aspect of ONPASSIVE's operations, and neither had any expertise to develop a suite of computer applications using AI.

67.     While Defendants retained an information technology ("IT") outsourcing firm in September 2018 and subsequently brought IT personnel in-house, at Defendants' direction the IT firm and in-house personnel focused their efforts, at least during the first two years, on developing ONPASSIVE's Back Office for purposes of recruiting investors rather than the software applications ONPASSIVE was purportedly "launching."  As mentioned, as of August 2020, the same month that Defendants announced that the product suite would include 30 software applications that would work together in an "ecosystem," Defendants had

completed only two comparatively simple software applications (an internet protocol address ("IP") tracker and a uniform resource locator ("URL") shortener), equivalents of which were already readily available to the public online for free.

68.    In November 2022, Defendants made available to the general public four applications, including the IP tracker and URL shortener, all free of charge. Defendants have since offered two additional applications available to the general public free of charge.  As of June 30, 2023, the remaining 44 applications had yet to be released and the product "launch," defined as the commercial offering of product, which is supposed to prompt the payment of monthly subscription fees generating commissions, had yet to occur.

69.    Defendants' misrepresentations were material to investors' decisions whether to invest because only after the product launch could investors expect their first returns in the form of commissions.  The misrepresentations that launch would likely occur within specified short timeframes would also have spurred Founders holding free positions to pay their $97 fees before the window closed.

70.    At the time he made each of the statements set forth in paragraph 64 above, Mufareh knew or was reckless in not knowing that the statements were materially false and misleading.  Specifically, he knew or was reckless in not knowing at the time of each statement that development of applications had not yet started, let alone progressed to the point that product launch could occur within the

timeframes specified, and that ONPASSIVE lacked the capacity to develop the applications in the timeframes specified.

### C. Defendants Created Counterfeit and Misleading Websites on Which to Post Fake Independent Third-Party Positive Reviews

71.     In early 2019, pre-existing and independently-operated third-party MLM review blog websites, "Review Site 1" and "Review Site 2," posted multiple negative reviews of the Defendants.

72.     Illustrative of the negative reviews were the following:

a.     On January 7, 2019, Review Site 1 posted that, "there's inherently nothing of particular interest with ONPASSIVE.  It's literally nothing more than a pyramid scheme launched by a serial scammer."

b.     On or before February 28, 2019, Review Site 2 posted that, "ONPASSIVE is a scam, and here is our main reason why: No retail products offered.  Sure the company offers a[ ] [marketing] platform that you can gain access to, but only as an [MLM] affiliate member."

73.     The Defendants initially responded to the negative reviews by telling participants to "ignore the haters."  When the negative reviews persisted, however, Mufareh approved in November 2019 the creation of counterfeit and intentionally misleading websites mimicking the names and appearances of the above-mentioned existing websites and the writing and posting on the counterfeit websites of positive reviews of ONPASSIVE and Mufareh.  ONPASSIVE

29

personnel specifically proposed to Mufareh—and he agreed to the proposal—that they would "us[e] these two [counterfeit] sites as 3rd party site," "write … exclusive review[s] on our own brand (just like a 3rd persons writing)," and use both counterfeit websites "to influence the people," with the "first target assigned [being] to knock down those [review sites] from the search results."

74.    The names of the two counterfeit sites purposely tracked the names of existing MLM review websites in their web URL addresses with slightly altered domain names: the domain extension ".us" of the counterfeit Review Site 1 site differed from the domain extension ".com" of the existing Review Site 1, and the domain name of the counterfeit Review Site 2 differed from that of the existing Review Site 2 only in the substitution of the singular for the plural of Review Site 2's name.  Logos appearing at the top of each page of the counterfeit websites included the text of Review Site 1's and Review Site 2's names.

75.    In November 2019, Mufareh personally registered the two counterfeit websites, paying to have the sites registered under the name of a "domain proxy" to conceal his and ONPASSIVE's involvement with the websites.  By concealing their involvement, Mufareh and ONPASSIVE sought to deceive investors into thinking that the reviews posted on the counterfeit sites were objectively made by independent third parties.

76.     As directed by Mufareh, to whom they reported regularly on their progress, ONPASSIVE personnel set about operating the websites starting in late 2019 in a manner to mislead visitors as to the sites' objectivity.  For example, in the counterfeit Review Site 1 "About" section, ONPASSIVE personnel wrote:

> Our only objective is to educate users who are searching for companies [including] MLM (primary target industry) … [We] summarize a company's overall status and reputation in the market.  These reviews could help any user to identify and decide whether to approach a company or not to for any business or professional reasons.

Further, ONPASSIVE personnel not only posted reviews of Mufareh and ONPASSIVE, which were uniformly favorable, but also posted reviews of other programs and advice on MLMs generally, which tracked third-party MLM review sites, so as to further the deception.

77.     As authorized by Mufareh, ONPASSIVE personnel wrote and posted seven positive reviews of Mufareh and ONPASSIVE on the counterfeit Review Site 2 website between November 2019 and March 2020, seven of which remained online until at least November 2021, and six of which remained online until at least October 2022.  One such review, posted on November 30, 2019, stated, "Do we recommend you to Join ONPASSIVE?  The answer is – YES, we do recommend you to be part of ONPASSIVE. … And it's a scam-free, fully legit and compliant and has a global presence in more than 100+ countries."

31

78.    As authorized by Mufareh, ONPASSIVE personnel wrote and posted six positive reviews of Mufareh and ONPASSIVE on the counterfeit Review Site 2 between December 2019 and March 2020, which remained posted online until at least October 2022.  One such review, posted on February 16, 2020, stated, "Why do I believe that ONPASSIVE is responsible for taking my business goals to heights, which I never thought I could?  … With all of these advantages in front of my eyes, I couldn't stay blind and not plunge into becoming a member of ONPASSIVE."

79.    The creation of the counterfeit websites and posting of fake positive reviews of Mufareh and ONPASSIVE acted as a deceit on investors by falsely purporting to be objective third-party sites and data.  In addition, in omitting to disclose that the sites and reviews were controlled by ONPASSIVE and its personnel, the statements made were materially misleading.

80.    Mufareh authorized and participated in the creation of the counterfeit websites and authorized the posting of the internally-generated positive reviews of himself and ONPASSIVE.

81.    Mufareh understood the impact on investors of positive reviews posted to MLM websites, observing in a June 11, 2020, webinar posted to the Back Office, for example, that someone who spots a positive review online was more

likely to register for the ONPASSIVE MLM and pay the $97 fee to become a Founder.

82.     A reasonable investor would have wanted to know that the websites were counterfeit, that they were owned and controlled by Mufareh and ONPASSIVE, and that the positive reviews were not independent but instead written by ONPASSIVE personnel.

83.     Mufareh knew or was reckless in not knowing that the creation of the counterfeit websites and posting of fake positive reviews of Mufareh and ONPASSIVE was a device, scheme or artifice to defraud and operated or would operate as a fraud or deceit on investors because purporting to be objective third-party sites and reviews, and that, in omitting to disclose that the sites were created and operated by ONPASSIVE and that the postings were internally generated by ONPASSIVE personnel, those statements that were made were materially misleading as a result because falsely conveying that they were the product of objective third-parties.

84.     Further, Mufareh knew or was reckless in not knowing that the operation of the pyramid scheme, the creation of the counterfeit websites, and the material misrepresentations and omissions collectively constituted a scheme to defraud and operated or would operate as a fraud or deceit on investors.  Mufareh's scienter is imputable to ONPASSIVE.

## III.   DEFENDANTS AND RELIEF DEFENDANT ASMAHAN MUFAREH RECEIVED INVESTORS' FUNDS

85.   As a result of the foregoing, as of March 2023, Defendants had raised in excess of $108 million in illicit proceeds from investors.  Investors made payments via a variety of different methods, including in crypto assets, cash, check, wire transfers, and various third-party payment services.  All of these payments went into accounts which were and/or are subject to Mufareh's and/or Asmahan Mufareh's control.

86.    Mufareh and/or Asmahan Mufareh have converted a sizeable quantity of investors payments into crypto assets, while holding other proceeds in accounts with financial institutions.  From these proceeds, Mufareh and Asmahan Mufareh have expended substantial sums on personal expenses, including fine dining, luxury resort stays, car rentals, day spas, hair salons, martial arts lessons, and jewelry purchases.

87.   Mufareh, ONPASSIVE, and Asmahan Mufareh have received ill-gotten funds, and do not have a legitimate claim to those funds.

## IV.   DEFENDANTS ENGAGED IN THE UNREGISTERED OFFER AND SALE OF SECURITIES

88.   Federal securities laws require that those offering or selling securities disclose certain information by filing a registration statement with the SEC.  This

information allows investors to make informed judgments about whether to purchase the securities.

89.    Mufareh and ONPASSIVE offered and sold opportunities to invest in a pyramid scheme to the general public, including investors throughout the United States, and raised at least $108 million in investor proceeds.

90.    Mufareh and ONPASSIVE pooled these investor funds to operate the business to include developing and marketing the purported ecosystem of software applications and make the MLM opportunity profitable.  Accordingly, investors' expectations of profit were, and still are, dependent on Mufareh's and ONPASSIVE's ability and supposed efforts to develop the purported product and make the MLM opportunity a profitable endeavor.

91.    The offer and sale of the opportunity to participate in ONPASSIVE, which is a pyramid scheme, constituted an investment contract and, therefore, a security.

92.    The offer and sale of the opportunity to participate in the ONPASSIVE pyramid scheme was not registered with the SEC.  No exemption from registration applied.

## <u>FIRST CLAIM FOR RELIEF</u>
### Unregistered Offers and Sales of Securities
### in Violation of Securities Act Sections 5(a) and 5(c)
### (Against Both Defendants)

93.    Paragraphs 1 through 92 are realleged and incorporated by reference as though fully set forth herein.

94.    Investors in Defendants' pyramid-structured sales program made investments of money in a common enterprise about which they were led to expect profits from the efforts of Defendants or third parties.

95.    Investors' subscriptions in the Defendants' pyramid-structured sales program constituted investment contracts, which are securities.

96.    By engaging in the conduct described above, Defendants, singly and in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

97.    By engaging in the conduct described above, Defendants directly or indirectly violated, and unless enjoined are reasonably likely to continue to violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

36

## SECOND CLAIM FOR RELIEF
**Fraud in Violation of Securities Act Sections 17(a)(1)-(a)(3)**
**(Against Both Defendants)**

98.    Paragraphs 1 through 92 are realleged and incorporated by reference as though fully set forth herein.

99.    By engaging in the conduct described above, Defendants, in the offer or sale of any securities by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

  a.    knowingly or recklessly employed a device, scheme, or artifice to defraud;

  b.    negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

  c.    negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

100.   By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 17(a)(1) - (a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1) - (a)(3)].

### THIRD CLAIM FOR RELIEF
**Fraud in Connection with the Purchase or Sale of Securities**
**in Violation of Exchange Act Section 10(b) and Rules 10b-5(a) - (c)**
**Thereunder**
**(Against Both Defendants)**

101.   Paragraphs 1 through 92 are realleged and incorporated by reference as though fully set forth herein.

102.   By engaging in the conduct described above, Defendants directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails knowingly or recklessly:

      a.   employed a device, scheme, or artifice to defraud;

      b.   made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

      c.   engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

103.   By engaging in the foregoing misconduct, Defendants violated, and unless enjoined are reasonably likely to continue to violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) - (c) [17C.F.R. § 240.10b-5(a) - (c)] thereunder.

## FOURTH CLAIM FOR RELIEF
### Violation, as a Control Person, of Exchange Act Section 10(b) and Rule 10b-5(a) - (c)
### (Against Defendant Mufareh)

104.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 92 inclusive.

105.    As alleged above, ONPASSIVE violated Exchange Act Section 10(b) and Rule 10b-5(a) - (c).

106.    At all relevant times, Mufareh controlled ONPASSIVE and was a culpable participant in its violations of Exchange Act Section 10(b) and Rule 10b-5(a) - (c).

107.    By reason of the foregoing, Mufareh is liable as a controlling person, pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)], for ONPASSIVE'S violations of Exchange Act Section 10(b) and Rules 10b-5(a) - (c) thereunder.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against the Relief Defendant)

108.    Paragraphs 1 through 92 are realleged and incorporated by reference as though fully set forth herein.

109.    Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)] states: "In any action or proceeding brought or instituted by the SEC under any provision of the securities laws, the SEC may seek, and any Federal court may grant, any

equitable relief that may be appropriate or necessary for the benefit of investors."

110.   As alleged in paragraphs 1 through 92 above, Relief Defendant Asmahan Mufareh received investor funds and assets that were the proceeds, or are traceable to the proceeds, of Defendants' unlawful activities, and Relief Defendant Asmahan Mufareh has no legitimate claims to those proceeds and gave no consideration for exchange of those funds.

111.   Relief Defendant Asmahan Mufareh obtained the funds and assets as part of and in furtherance of the securities violations alleged in paragraphs 1 through 92 above and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds and assets.  As a consequence, Relief Defendant Asmahan Mufareh was unjustly enriched.

## RELIEF REQUESTED

**WHEREFORE**, the SEC respectfully requests the Court find that Defendants committed the violations charged and that, as a result of these violations, Defendants and Relief Defendant Asmahan Mufareh received ill-gotten gains; and enter Final Judgments:

# I.

## **Permanent Injunction**

Permanently restraining and enjoining Defendants Mufareh and

ONPASSIVE, their officers, agents, servants, employees, attorneys, and all persons

in active concert or participation with them, and each of them, from directly or

indirectly violating the federal securities laws alleged in this Complaint; and

further permanently restraining and enjoining Defendants, their officers, agents,

servants, employees, attorneys, and all persons in active concert or participation

with them, and each of them, from directly or indirectly offering, operating, or

participating in any marketing or sales program in which a participant is

compensated or promised compensation solely or primarily for inducing another

person to become a participant in the program, or if such induced person induces

another to become a participant in the program.

# II.

## **Disgorgement with Prejudgment Interest**

Ordering Defendants and Relief Defendant Asmahan Mufareh to disgorge

all ill-gotten gains, with prejudgment interest, as a result of the acts or courses of

conduct alleged in this Complaint, with disgorgement from the Defendants to be on

a joint and several basis, pursuant to Exchange Act Section 21(d)(3), (5), and (7)

[15 U.S.C. § 78u(d)(3), (5), and (7)].

### III.

### **Civil Money Penalties**

Ordering Defendants Mufareh and ONPASSIVE to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].

### IV.

### **Officer and Director Bar**

Prohibiting Defendant Mufareh from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)].

### V.

### **Further Relief**

Granting such other and further relief as the Court determines to be necessary and appropriate.

# VI.

## **Retention of Jurisdiction**

Further, the SEC respectfully requests the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the SEC for additional relief within the jurisdiction of this Court.

## **DEMAND FOR A JURY TRIAL**

Pursuant to Rules 38(b) and 39(a) of the Federal Rules of Civil Procedure, the SEC demands trial by jury on all issues so triable.

Respectfully submitted,

August 11, 2023

By: */s/ Gregory N. Miller*
Gregory N. Miller
Assistant Chief Trial Counsel
Florida Bar # 0976652
(202) 551-4469
millergn@sec.gov
Michael J. Friedman
New York Bar # 4297461
Assistant Chief Trial Counsel
(202) 551-7977
friedmanmi@sec.gov
100 F Street, N.E.
Washington, D.C.  20549

*Attorneys for Plaintiff*
*Securities and Exchange Commission*