# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 6:23-cv-01539-PGB-RMN** |
| **ASHRAF MUFAREH, ONPASSIVE LLC, and ASMAHAN MUFAREH,** | |
| **Defendants.** | |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

<u>Page</u>

I.     INTRODUCTION ............................................................1

II.    BACKGROUND ............................................................4

III.   LEGAL STANDARD ....................................................7

IV.   ARGUMENT ..................................................................8

      A.    The Complaint Should Be Dismissed As An Impermissible Shotgun Pleading..............................................8

      B.    The Complaint Fails To State A Claim For Violations Of The Antifraud Provisions Of The Securities Act And The Securities And Exchange Act. ........................................9

            1.    The Complaint Does Not Allege An Actionable Misstatement Or Omission. ..................................9

                  a.    Statements About OnPassive's Legality Are Not Actionable................................... 10

                  b.    Statements About The Timing of Product Launch Are Not Actionable. ................... 11

                  c.    Statements About Potential Income Opportunities As An OnPassive Customer Are Not Actionable........................................... 16

            2.    The SEC Fails To Plead Conduct To Support The Existence Of Any Scheme To Defraud.............................. 18

            3.    The Complaint Fails to Allege Scienter Adequately.......... 20

      C.    The Complaint Does Not State A Claim For Unjust Enrichment Against Asmahan Mufareh. .................................... 23

V.    CONCLUSION........................................................... 25

## TABLE OF AUTHORITIES

Page(s)

### CASES

*In re Apple Sec. Litig.,*
2020 WL 2857397 (N.D. Cal. June 2, 2020) ................................................. 10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .......................................................................................7

*Barmapov v. Amuial,*
986 F.3d 1321 (11th Cir. 2021) ................................................................ 8, 18

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .......................................................................................7

*Carlucci v. Han,*
886 F. Supp. 2d 497 (E.D. Va. 2012) ........................................................... 17

*Carvelli v. Ocwen Fin. Corp.,*
934 F.3d 1307 (11th Cir. 2019) .................................................................... 11

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.,*
129 F. Supp. 3d 48 (S.D.N.Y. 2015) ............................................................. 10

*De Ford v. Koutoulas,*
2022 WL 19842617 (M.D. Fla. July 11, 2022) .............................................. 18

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.,*
595 F. Supp. 2d 1253 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783
(11th Cir. 2010) ........................................................................................... 23

*Hinkle v. Cont'l Motors, Inc.,*
2017 WL 3131465 (M.D. Fla. July 24, 2017) ................................................7

*Horne v. Potter,*
392 F. App'x 800 (11th Cir. 2010) ............................................................... 19

*Kalnit v. Eichler,*
264 F.3d 131 (2d Cir. 2001) ......................................................................... 23

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.,*
518 F. Supp. 3d. 772 (S.D.N.Y. 2021) .................................................... 21, 22

TABLE OF AUTHORITIES

Page(s)

*Meide v. Pulse Evolution Corp.*,
   2020 WL 5350325 (M.D. Fla. Sept. 4, 2020)................................ 17

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008)........................................................8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) .......................................................... 10, 11, 13

*S.-Owners Ins. Co. v. Waterhouse Corp.*,
   2022 WL 20677887 (M.D. Fla. July 25, 2022) ........................... 20

*SEC v. Founding Partners Cap. Mgmt.*,
   639 F. Supp. 2d 1291 (M.D. Fla. 2009) ................................ 23, 24

*SEC v. Hwang*,
   2023 WL 6124041 (S.D.N.Y. Sept. 19, 2023) ............................ 21

*SEC v. Pegasus Wireless Corp.*,
   2009 WL 3047223 (N.D. Cal. Sept. 21, 2009) ........................... 24

*SEC v. Roanoke Tech. Corp.*,
   2006 WL 3813755 (M.D. Fla. Dec. 26, 2006) ............... 7, 9, 12, 18

*SEC v. Solow*,
   2007 WL 917269 (S.D. Fla. Mar. 23, 2007) ............................... 22

*SEC v. Spinosa*,
   31 F. Supp. 3d 1371 (S.D. Fla. 2014) ........................................ 21

*SEC v. Yuen*,
   221 F.R.D. 631 (C.D. Cal. 2004) ............................................... 22

*In re Sportsline.com Sec. Litig.*,
   366 F. Supp. 2d 1159 (S.D. Fla. 2004) ...................................... 21

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867 (C.D. Cal. 2020)........................................ 14

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007)...................................... 17

TABLE OF AUTHORITIES

Page(s)

*Williams v. MJC Acquisition, LLC*,
   2020 WL 597464 (S.D. W. Va. Feb. 6, 2020)................................................. 19

*Zelinski v. Securian Fin. Grp., Inc.*,
   2020 WL 3270605 (M.D. Fla. June 17, 2020) .................................................9

## RULES

Fed. R. Civ. P. 9(b) .............................................................. 7, 8, 18, 21

Fed. R. Civ. P. 10(b) ....................................................................8

## OTHER AUTHORITIES

*Beware of Pyramid Schemes Posing as Multi-Level Marketing
   Programs,* U.S. Securities and Exchange Commission
   (Oct. 1, 2013), https://www.sec.gov/oiea/investor-alerts-
   bulletins/investor-alerts-ia-pyramid...................................................... 19, 20

Defendants Ashraf Mufareh and OnPassive LLC, and Relief Defendant Asmahan Mufareh, respectfully submit this memorandum of law in support of their motion to dismiss the Securities and Exchange Commission's Complaint for Permanent Injunctive and Other Relief (ECF No. 2) in full as a "shotgun" pleading.  In the alternative, Defendants' move to dismiss Claims II, III, and V[1] of the Complaint for failure to state a claim.[2]

## I.    INTRODUCTION

Mr. and Mrs. Mufareh founded OnPassive in 2018 to develop a marketing tool for online businesses.  OnPassive later pivoted to creating a suite of software products that includes an email service, video conferencing, and social networking.  OnPassive's vision is to integrate these services and others into a single ecosystem that meets users' communication, shopping, entertainment, and business needs.  OnPassive's team of engineers has had success pursuing this vision, having designed and launched several products.

The Complaint takes aim at the Mufarehs and OnPassive in two principal ways.  It attacks OnPassive's business model, alleging that it is based

---

[1] Although Defendants do not move to dismiss Claim I of the Complaint, which alleges violations of Sections 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. 77e—except to the extent that the entire Complaint is a "shotgun" pleading—they deny that they offered or sold securities and are confident that the SEC will be unable to prove its claim.  Solely because Defendants do not move against all alleged false statements, *see infra* n.4, Defendants likewise do not move to dismiss Claim IV of the Complaint, which alleges control person liability.  Defendants deny any control person liability.

[2] Unless otherwise indicated, all citations and internal quotation marks are omitted.

on the unregistered sale of securities and also that it operates as a "pyramid scheme." It further alleges that certain statements by Mr. Mufareh were intentional misstatements. The Complaint fails to state a claim for fraud with respect to either OnPassive's business model or all but one of those statements.

The Complaint should be dismissed because it constitutes classic "shotgun" pleading and, consequently, provides inadequate notice as to how its allegations relate to its specific claims. Notably, the Complaint offers no indication of whether (let alone how and to what extent) allegations attacking OnPassive's business model relate to the unregistered sale of securities claim or to the fraud claim. Courts routinely dismiss similarly defective pleadings.

The fraud claims in the Complaint should also be dismissed because the allegations concerning the OnPassive business model describe nothing other than the type of multi-level marketing program that courts routinely find to be lawful. The Complaint seems to take issue with how OnPassive has marketed itself. It alleges that, for a fee of $97, OnPassive offered early adopters of its technology, known as "Founders," access to webinars and other informational materials, early access to OnPassive's products, and the opportunity to earn commissions as "Resellers" of those products. Critically, the Complaint does not allege (because it cannot) that the Founders were to be paid based on the sale of Founder positions. Allowing early adopters the opportunity to earn commissions by facilitating the sales of actual products is a classic, and lawful,

multi-level marketing structure.  Repeatedly calling OnPassive a "pyramid scheme," while inflammatory, does not state a claim for fraud.

The Complaint similarly fails to state a claim for fraud with respect to the following allegedly false statements:

- The Complaint alleges that Defendants falsely claimed that OnPassive operated legally but fails to allege, as it must, that they did not believe those statements.

- The Complaint asserts that Defendants made misstatements about when OnPassive products would launch.  But those statements, far from offering a specific timeline, included the type of qualifying language one would expect of product development progress updates.  Put differently, the Complaint does not allege definitive dates that were not met.  Nor does it allege, as it must, that Mr. Mufareh did not believe that his statements were true.[3]

- The Complaint alleges that Defendants made false statements about the amount of money OnPassive customers could potentially earn.  Those alleged statements amount to nothing more than inactionable puffery.

In short, none of these statements constitute an actionable misstatement or omission sufficient to state a claim for securities fraud.[4]

---

[3] To be clear, this is not a case where the SEC alleges that OnPassive failed to launch products because it never intended to do so.  The Complaint really boils down to the SEC's apparent conclusion that OnPassive simply did not launch products quickly enough.  That ignores the delays common to internet startups and is insufficient to state a securities fraud claim.

[4] The Complaint also alleges that Defendants made false statements by creating websites that offered positive reviews of OnPassive without disclosing OnPassive's affiliation with the websites.  While Defendants deny these allegations and expect to be vindicated on the merits of such claims after discovery, those allegations are not the subject of this motion (except to the extent that the entire Complaint is dismissed as a "shotgun" pleading).  Similarly, Plaintiffs claims based on Section 17(a)(2) and 17(a)(3) (parts of Claim II) do not require scienter.  Accordingly, Defendants do not move to dismiss Claim II with regard to those provisions on grounds of scienter, although they do move to dismiss on the other grounds set forth in this motion.

The Complaint's Section 17(a)(1) and Rule 10b-5 fraud claims should also be dismissed for the independent reason that the Complaint does not adequately allege scienter.  It contains no facts that show conscious misbehavior or recklessness, or motive and opportunity.  Indeed, the only facts alleged about money obtained from the business by Mr. Mufareh are entirely consistent with the level of compensation legitimately paid to the founder of a founder-run business.

Finally, the Complaint fails to state a claim for unjust enrichment against Mrs. Mufareh as a Relief Defendant.  It contains no allegations that she lacked a legitimate interest in the unspecified amount of funds transferred into accounts in her name.

Accordingly, as set forth below, in addition to the Complaint's deficiencies as a shotgun pleading, the SEC fails to state a claim with respect to Claims II, III and V of the Complaint.

## II.   BACKGROUND

Mr. Mufareh founded OnPassive in 2018 to develop an artificial intelligence-driven marketing tool for online businesses.   ¶¶ 2, 33.   In September 2018, he retained an information technology firm, and thereafter he hired in-house IT personnel, to operationalize his early product vision.  ¶ 67.  But OnPassive soon pivoted, as many internet startups do.  By the following year, it began developing a full suite of software as a service ("SaaS") products,

including email, video conferencing, and social networking services.   ¶ 34. Indeed, between August 2019 and December 2021, the number of computer applications in OnPassive's development pipeline more than doubled from 20 to over 50.   ¶ 33.   OnPassive, unlike most market entrants that offer a single product or multiple standalone products, sought to have all of its products work together in a seamless ecosystem.   ¶¶ 2, 67.

The first product that OnPassive made available was a private website called the "Back Office."   ¶¶ 26, 67.   The Back Office is the backbone of the OnPassive ecosystem.   It provides information about OnPassive, and OnPassive's innovative and expanding product offerings, through webinars and other digital media.   ¶¶ 26, 27, 64(f).   The first users of the Back Office were early adopters of OnPassive, known as "Founders."   ¶ 24.   Founders paid $97 for access to the Back Office's content, the potential for early and preferential access to OnPassive's expanding product network, and the opportunity to become "Resellers" of those products.   ¶¶ 24, 26, 38.

In August 2020, OnPassive launched two additional applications for the Founders' early use: O-Tracker (a real-time IP tracking tool to optimize website performance by tracking key metrics and trends across digital channels) and O-Trim (a web address (URL) shortener to simplify sending URLs across social media platforms).   ¶ 67.   Then, in November 2022, OnPassive launched two cornerstones of the OnPassive ecosystem: O-Mail (an email service) and O-Net

5

(a social media platform).  ¶ 68.  By June 30, 2023, OnPassive had released two additional products: O-Chat (a technical support platform for its ecosystem) and O-Connect (video communication software).  ¶ 68.

Although OnPassive launched some products free of charge, Mr. Mufareh planned to release most using an SaaS model in which customers would pay a monthly fee to use them.  ¶ 34.  He planned to deploy an MLM structure, where Founders or other individuals could purchase a product package and elect to become Resellers.  ¶¶ 38, 41.  Resellers would then earn commissions on their own direct sales of products and on indirect sales of products by individuals who they recruited to become Resellers.  ¶¶ 24, 48, 54. While many Resellers are also Founders (and *vice versa*), membership in one group does not require participation in both.  ¶ 24.

If Founders chose to become Resellers, their payments of the $97 Founders fee would have earned them a higher placement in the potential commissions structure.  ¶¶ 4, 24, 44.  However, payment of that fee did not guarantee Founders any commissions, and the Complaint does not allege that OnPassive ever contemplated paying commissions to an individual based on recruitment of other Founders.  Commissions were to be based solely on the sale of software products.  ¶¶ 23, 39, 54.  Given that earning a commission required sales of product, OnPassive's marketing materials made clear to Founders and other potential Resellers that "success with ONPASSIVE

6

requires hard work, commitment, leadership and desire." ¶ 50.  OnPassive never launched the reselling program and never paid commissions.  ¶¶ 15, 68.

In November 2020, the SEC issued subpoenas to Mr. and Mrs. Mufareh and OnPassive.  After investigating for almost three years, it filed this case, alleging that Defendants made false or misleading statements about the legality of OnPassive, the timing of product launches, positive website reviews, and potential income opportunities for Founders.  *See* ¶¶ 47–52, 60–84.

## III.   LEGAL STANDARD

A complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plaintiffs cannot simply include formulaic recitations of the elements of a cause of action, *Twombly*, 550 U.S. at 555, and the Court need not accept "legal conclusions," "naked assertions," "mere conclusory statements," or inferences without "facial plausibility."  *Iqbal*, 556 U.S.  at 677–78.  Rather, "a complaint must contain sufficient factual matter" to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Hinkle v. Cont'l Motors, Inc.*, 2017 WL 3131465, at *2 (M.D. Fla. July 24, 2017).

Securities fraud claims—like those alleged here—are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  *SEC v. Roanoke Tech. Corp.*, 2006 WL 3813755, at *3 (M.D. Fla.

Dec. 26, 2006).  Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), including the "who, what, when, where, and how of the allegedly false statements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

## IV.   ARGUMENT

### A.   The Complaint Should Be Dismissed As An Impermissible Shotgun Pleading.

The Complaint constitutes a classic "shotgun" pleading for which courts in the Eleventh Circuit have "little tolerance."  *Barmapov v. Amuial,* 986 F.3d 1321, 1325 (11th Cir. 2021).  The prohibition against "shotgun" pleading is rooted in Federal Rule of Civil Procedure 10(b), which requires a party to "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances."  Fed. R. Civ. P. 10(b).  Simply put, Defendants must have adequate notice of the claims against them in order to frame a responsive pleading and the court must be able to discern whether the plaintiff has stated any claim for relief.  *Barmapov*, 986 F.3d at 1324.

The Complaint falls squarely within the definition of a "shotgun" pleading in that it is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action."  *Barmapov*, 986 F.3d at 1324.  All five Claims for Relief incorporate each of the ninety-two general factual allegations and then simply make conclusory statements of the

elements of the cause of action.  *See* ¶¶93–111.  It is virtually impossible to figure out, for example, whether allegations that OnPassive is a "pyramid scheme," ¶¶ 53–59, are intended to support the claim for the purported unregistered sale of securities (Claim I) or the fraud claims (Claims II and III). Accordingly, the Complaint should be dismissed in its entirety.  *See Zelinski v. Securian Fin. Grp., Inc.*, 2020 WL 3270605, at *2 (M.D. Fla. June 17, 2020) (dismissing shotgun pleading where "each count fails to identify . . . which material facts supports each claim" and complaint instead provided "a few barebone statements setting forth the elements for each cause of action.").

**B. The Complaint Fails To State A Claim For Violations Of The Antifraud Provisions Of The Securities Act And The Securities And Exchange Act.**

To state a claim for violations of the antifraud provisions of the Securities Act and the Securities and Exchange Act of 1934 (Claims II and III), the Complaint must plead either (1) a material misrepresentation or omission or (2) a deceptive act in furtherance of the alleged scheme to defraud.  *Roanoke Tech. Corp.*, 2006 WL 3813755, at *2–3.  It does neither.  The Complaint also fails because it does not plead scienter in support of its Section 17(a)(1) and Rule 10b-5 claims.  ¶¶ 98–103.

**1. The Complaint Does Not Allege An Actionable Misstatement Or Omission.**

The SEC bases its fraud claims in part on the following supposedly false

or misleading statements: (1) statements about OnPassive's legality, (2) statements about the timing of its product releases, and (3) statements about the potential income opportunities for Founders.  *See* ¶¶ 47–52, 60–84. None are actionable under the securities laws.

        a.    Statements About OnPassive's Legality Are Not Actionable.

The Complaint challenges statements commenting on OnPassive's legal compliance, such as: "WE ARE FULLY LEGAL-WORLDWIDE."[5]  ¶¶ 61(a)–(b). But statements about the legality of a business constitute opinions and are not, without more, an adequate basis for a securities law claim.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189–91, 194–95 (2015); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 81–82 (S.D.N.Y. 2015); *In re Apple Sec. Litig.*, 2020 WL 2857397, at *15–16 (N.D. Cal. June 2, 2020).  Here, the SEC has failed to allege anything "more" that would make such statements actionable.

Specifically, the Complaint fails to allege, as it must, that Mr. Mufareh "did not hold the belief [he] professed."  *Omnicare*, 575 U.S. at 186.[6]  It lacks

---

[5] The Complaint also alleges that e-books contained the statements "WE ARE FULLY COMPLIANT-WORLDWIDE"; and "WE WILL NOT be shut down by a government; THEY WILL USE OUR PRODUCTS!"  ¶ 61(b).

[6] In the alternative, had the SEC relied under *Omnicare* on a theory that a statement of fact contained within an opinion was materially misleading, it would have needed to allege that the supporting fact was untrue.  *Id.* at 185–86.  The Complaint fails to allege that Mr. Mufareh included any untrue facts in his statements.

any allegation that he did not believe that OnPassive was compliant with the law, let alone any particularized facts to support such an allegation.  Instead, it alleges that Mr. Mufareh's "whole course of dealings . . . reflect his awareness that ONPASSIVE is an illegal pyramid scheme."  ¶ 63.  But the SEC does not plead with specificity—or any detail at all—what about Mr. Mufareh's "course of dealings" demonstrates his knowledge that OnPassive was *not* legally compliant.  Such a conclusory allegation comes nowhere near satisfying *Omnicare.* 575 U.S.  at 185–89.

Moreover, Mr. Mufareh's statement that OnPassive would not be shut down because "[the Government] will use [OnPassive's] products," ¶ 61(b), is inactionable puffery.  No person could reasonably interpret the statement to be an assertion of fact that, for example, the government had entered into an agreement to use OnPassive's products.  *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318–22 (11th Cir. 2019) (holding that some statements "are just too booterish to justify reasonable reliance" and are thus not material to a reasonable person's decision).

        b.     Statements About The Timing of Product Launch Are Not Actionable.

The Complaint next challenges seven statements that Mr.  Mufareh and OnPassive allegedly made about the anticipated timing for the launch of OnPassive's products.  ¶¶ 64(a)–(h).  As support for its claim of falsity, the

Complaint alleges that OnPassive lacked the personnel necessary to develop the applications along the timelines indicated.  ¶ 66.  It also alleges, without support, that all development efforts through August 2020 were focused on developing the Back Office to promote the Founders program and not on developing products.  ¶ 65.  Even accepting these allegations as true, none of the challenged statements can support a claim for securities fraud.

First, a majority of the statements do not promise to launch products on any specific date.  *E.g.*, ¶¶ 64(b)–(e).  Accordingly, they cannot be false or misleading in that regard.  *See Roanoke*, 2006 WL 3813755, at *2–3 (falsity is required to plead securities fraud).  Rather, the following statements just provide updates on OnPassive's progress, and the Complaint does not plead any facts that demonstrate those progress reports were false or misleading:

| No. | Date[7] | Statement | Citation |
|-----|---------|-----------|----------|
| 1 | 9/25/2018 | "We're closer to launch, we're in the second half, maybe the last third, and you do the math . . . *I don't have a date*, I'm going to touch up on that respectfully, is it realistic to launch in the next 30 days? *Very much possible* I would say okay?" | ¶ 64(b) |
| 2 | 10/3/2018 | "*We are definitely closer to the launch than when we announced this concept* let's say in the past, so we're clearly in the probably last third or quarter maybe." | ¶ 64(c) |
| 3 | 4/25/2019 | "In June we will have a kick start party in Orlando. Last weekend of June.  Celebrate launch or opening *whether it's already open or getting tested just ready to launch.*" | ¶ 64(d) |
| 4 | 3/26/2020 | "ONPASSIVE is going to launch . . . it is everything | ¶ 64(e) |

[7] Dates and statements reflect allegations in the Complaint, *see* ¶¶ 64(a)–(h), and all emphases are added.

| | | *looking good for* 2020" | |
|---|---|---|---|

In Statement No. 1, Mr. Mufareh expressly states "I don't have a date [to launch products]," ¶ 64(b), which is the opposite of promising a date certain for product delivery.  It also explains that while OnPassive was "closer to launch," an actual launch in the near future remained "possible" but not certain.  *Id.* The Complaint does not allege any facts that contradict those statements.

Statement No. 2's assertion that OnPassive was "closer to the launch" is similar in that all it says is that OnPassive had made progress since announcing its concept.  ¶ 64(c).  That is a low bar, and nothing in the Complaint suggests that it had not.  Moreover, the notion that OnPassive was "closer" is an opinion, and there is nothing in the Complaint to support an inference that Mr. Mufareh did not genuinely believe it.  *See Omnicare*, 575 U.S. at 185–89.  Indeed, the Complaint alleges that, by the time of the statement, OnPassive had retained an outside IT firm to develop the product, which is consistent with being closer to launch.  ¶ 67.  Although Statement No. 2 also says that "we're clearly in the probably last third or quarter maybe," it is unclear if that means that launch would be in the last third or quarter of the year or that OnPassive was in the last third or quarter of the development phase.  In either case, there is nothing in the Complaint to suggest that either formulation was untrue.  Moreover, the statement itself includes the qualifiers "probably" and "maybe," which explicitly acknowledge that the projection was

uncertain, undermining any alleged falsity.

Statement No. 3 adds no clarity to the launch timeline.  ¶ 64(d).  It merely says that OnPassive would hold a party to celebrate "whether it's already open *or getting tested*."  ¶ 64(d) (emphasis added).

Finally, Statement No. 4, made with nine months left in 2020, remarks that everything was "looking good" for launch later in the year.  ¶ 64(e).  It does not promise that launch would happen, and the Complaint does not allege facts demonstrating that things were not "looking good."  Accordingly, none of these four statements are actionable.  *See In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 885–86 (C.D. Cal. 2020) (holding statements about company's "ongoing" work were not objectively false or misleading and, thus, not actionable).  Indeed, Mr. Mufareh's statement that everything was "looking good" was nothing more than his opinion, and—as with all of the other statements that are opinions—there are no allegations that his belief was not genuine.

Second, the balance of the challenged statements about product timing are nothing more than opinions, and the Complaint fails to allege that Mr. Mufareh did not genuinely believe them.  Those statements are:

| No. | Date[8] | Statement | Cite |
|---|---|---|---|
| 5 | 7/17/2018 | "I [Mr. Mufareh] will send an update when the program launches *in about one month*" | ¶ 64(a) |
| 6 | 8/6/2020<br>8/31/2020–<br>10/31/2020 | "ONPASSIVE is scheduled and set to launch in 2020 . . . 2020 . . . *If we need more time we will let you know* right now.  We don't feel there's any uh necessary time to launch . . . *We have plenty of time for the remaining portion of unfinished part of ONPASSIVE to complete it in 2020.*" | ¶¶ 64(f), (g) |
| 7 | 10/15/2020 | "realistically a few weeks" of testing [left].  "If now we are considered in pre-launch – how much more launch do you want – like okay just that ribbon cutting? It will happen. *It's a done deal in my mind*, that's why I operate as we already have a multi-billion dollar business in every country on the planet." | ¶ 64(h) |

With respect to Statement No. 5, the Complaint fails to allege that Mr. Mufareh did not believe that OnPassive could launch a product "in about a month." ¶ 64(a).  While it does contend that Mr. Mufareh and his wife were the only people involved with OnPassive at the time, ¶ 66, it also alleges that OnPassive had retained an IT outsourcing firm by September 2018. ¶ 67.  That undercuts any inference that Mr. Mufareh did not genuinely believe that OnPassive could launch a product in "about one month."[9]  ¶ 64(a).

Similarly, with respect to Statement No. 6, the Complaint fails to plead facts to support an inference that, as of August 2020, there was not "plenty of

---

[8] Dates and statements reflect allegations in the Complaint, *see* ¶¶ 64(a)-(h), and all emphases are added.

[9] That belief was particularly reasonable given that, at the time, OnPassive was focused on developing a single marketing tool. ¶ 31.  It did not expand its plans until 2020. ¶ 33.

time" for OnPassive to complete its work in the remaining four months of the year.  ¶¶ 64(f), (g).  Statement No. 6 also expressly contemplates the possibility that the launch date could shift, saying, "If we need more time we will let you know." *Id*.  Such hedging undermines any allegation that the statements are false.   And it makes sense.   Delays reasonably flow from developing complicated software products, and companies need flexibility to make strategic decisions about when to "launch."

Finally, with respect to Statement No. 7, the Complaint fails to cite to a single internal document, witness statement, or fact that contradicts Mr. Mufareh's statement that "in [*his*] mind" launch was a "done deal." ¶ 64(h).   That failure is egregious given the SEC's three-year pre-filing investigation.

> ### c. Statements About Potential Income Opportunities As An OnPassive Customer Are Not Actionable.

The Complaint alleges that the "most heavily marketed aspect" of the Founders program was the "potential size of the income opportunity," including alleged statements that it was possible under OnPassive's proposed "payment grid" for Founders to receive over $2 million per month.  ¶¶ 49–51.[10]

---

[10] The remaining allegations regarding the purported promise of *passive* income (*i.e.*, income derived solely due to OnPassive's efforts, as opposed to those of Founders), ¶¶ 44–52; 53–59, are irrelevant to the fraud claims.  At most they are relevant to whether OnPassive was selling an unregistered security (Claim I).  If necessary, OnPassive will address them after discovery on that topic.

But the Complaint mischaracterizes those statements, which were—at most—inactionable puffery. *See Meide v. Pulse Evolution Corp.*, 2020 WL 5350325, at *13 (M.D. Fla. Sept. 4, 2020) (puffery where statements are of the kind "which no sensible man takes seriously, and if he does he suffers from his credulity"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) (statements are inactionable puffery if they are "corporate optimism on which no reasonable investor would rely").

No reasonable Founder would view the reference to $2 million per month, for life, as an actual promise of potential commissions. *See Carlucci v. Han*, 886 F. Supp. 2d 497, 523–24 (E.D. Va. 2012) (statements that suggest exorbitant and atypical rates of return constitute non-actionable puffery). Accordingly, the "payment grid" cannot constitute an actionable misstatement.

Moreover, what the SEC describes as a "payment grid" (really just an undated marketing picture) contains a disclaimer stating clearly that it is illustrative in nature and that the earnings reflected in it should not be taken at face value. ¶ 50. It says, "Earnings vary depending on each individual affiliate's effort. The *income claims* presented *are not intended to serve as a guarantee of income*; instead, they're designed to give you an idea of what's possible. As with any business, success with ONPASSIVE requires hard work, commitment, leadership, and desire." *Id.* (emphasis added). That disclaimer was a clear flag to Founders, and undermines any allegation of falsity or

materiality.

> **2.     The SEC Fails To Plead Conduct To Support The Existence Of Any Scheme To Defraud.**

In lieu of alleging actionable false statements, the Complaint could theoretically state a claim for securities fraud under Section 17(a)(1), (3) of the Securities Act and Rule 10b-5(a), (c) of the Exchange Act if it pleaded some form of deceptive conduct. *See Roanoke*, 2006 WL 3813755, at *2–3. It is not at all clear from the face of the Complaint that the SEC has even attempted to do so. Indeed, as set forth *supra* Section A, the Complaint is a "shotgun pleading," in that it does not specify which allegations relate to which cause of action. *Barmapov*, 986 F.3d at 1324. Consequently, with respect to the SEC's fraud claims, Defendants are left without adequate notice of the claims against them and the grounds on which each claim rests. *See De Ford v. Koutoulas*, 2022 WL 19842617, at *1 (M.D. Fla. July 11, 2022) (Byron, J.).

Defendants' best guess—which they should not have to make—is that the SEC plans to support its claim for scheme liability with its allegation that OnPassive is a "pyramid scheme." ¶¶ 9, 53. That is a conclusory allegation that fails to satisfy Rule 9(b) and does not state a claim for securities fraud.[11]

First, despite repeatedly using the label "pyramid scheme" for

---

[11] To the extent the characterization of OnPassive as a "pyramid scheme" is relevant at all, it may be more relevant to Claim I, which relates to OnPassive's supposed sale of unregistered securities, but, again, Defendants are uncertain without adequate pleading.

inflammatory effect, the Complaint fails to allege any conduct that would render OnPassive's business inconsistent with that of a legal, multi-level marketing program. *See Williams v. MJC Acquisition, LLC*, 2020 WL 597464, at *4 (S.D. W. Va. Feb. 6, 2020) ("Though it is easy enough to draw parallels between MLM schemes and true pyramid promotional schemes, not all MLM businesses are illegal pyramid schemes."). The securities laws do not define "pyramid schemes," let alone make them *per se* illegal. Rather, the Complaint must plead with particularity the elements of a securities fraud claim, including a false statement or deceptive conduct. It cannot substitute a colloquial, pejorative characterization in lieu of particularized facts that satisfy the elements, yet that is exactly what the Complaint does.

Second, OnPassive's proposed business model does not meet the SEC's own definition of a "pyramid scheme." The SEC has acknowledged a difference between legitimate MLMs in which participants "typically get paid for products or services that [they] and the distributors in [their] 'downline' . . . sell to others" and "pyramid schemes" that constitute "a type of fraud in which participants profit almost exclusively through recruiting other people to participate in the program."[12] Put differently, but still in the SEC's own words,

---

[12] *Beware of Pyramid Schemes Posing as Multi-Level Marketing Programs,* U.S. Securities and Exchange Commission (Oct. 1, 2013), https://www.sec.gov/oiea/investor-alerts-bulletins/investor-alerts-ia-pyramid. "A district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment." *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010). "Because the above information derives from

an illegal "pyramid scheme" is an arrangement where "money from new participants is used to pay recruiting commissions . . . to earlier participants."[13] Yet, here, the Complaint concedes that Founders acting as Resellers were to be paid commissions based on the software they sold (whether directly or indirectly through others that they recruited), not on the sale of Founder positions or the recruitment of new Founders.   ¶ 24 (product purchases constituted "resales" and "a portion of the *monthly subscription fees paid by customers*" for resales would be paid as a commission) (emphasis added).  While Defendants do not concede that the SEC's definition of a "pyramid scheme" establishes a violation of the federal securities laws, its Complaint should be dismissed because its allegations are consistent with its stated understanding of a lawful MLM.

### 3.    The Complaint Fails to Allege Scienter Adequately.

The Complaint's Section 17(a)(1) and Rule 10b-5 securities fraud claims (Claims II and III) also fail because the Complaint does not adequately allege that Defendants acted with scienter.

To establish scienter, the SEC must plead either (1) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" or (2)

---

an official government website, the Court may take judicial notice of these facts."  *S.-Owners Ins. Co. v. Waterhouse Corp.*, 2022 WL 20677887, at *11 n.14 (M.D. Fla. July 25, 2022).

[13] *Beware of Pyramid Schemes*, https://www.sec.gov (Oct. 1, 2013).

"facts to show that defendants had both motive and opportunity to commit fraud." *SEC v. Hwang*, 2023 WL 6124041, at *6 (S.D.N.Y. Sept. 19, 2023); *see also SEC v. Spinosa*, 31 F. Supp. 3d 1371, 1377–78 (S.D. Fla. 2014).[14]  Yet the Complaint merely repeats for each of the categories of alleged misstatements the same boilerplate conclusion that Mr. Mufareh "knew or was reckless in not knowing" that the statements were fraudulent.  *See* ¶¶ 59, 63, 70, 83, 84. While Rule 9(b) permits a plaintiff to allege intent "generally," such conclusory allegations are insufficient unless they are accompanied by facts "giving rise to a strong inference of fraudulent intent." *Hwang*, 2023 WL 6124041, at *6. The Complaint contains none.

First, the Complaint cannot survive dismissal based on a theory of scienter rooted in recklessness, which requires a showing of an "extreme departure from the standards of ordinary care." *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1172 (S.D. Fla. 2004); *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 780 (S.D.N.Y. 2021).  The SEC contends that Mr. Mufareh's "whole course of dealings, as alleged in this complaint, reflect his awareness that ONPASSIVE is an illegal pyramid scheme." ¶ 63.  However, the Complaint provides no facts to explain what this

---

[14] It is unclear from the Complaint on which type of "scienter" the SEC bases its claims. However, to the extent the Complaint attempts to rely on circumstantial evidence of recklessness rather than motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater to support a finding of scienter." *Hwang*, 2023 WL 6124041, at *6.

"course of dealing" was or why it indicates any awareness that the business was illegal.  Such conclusory allegations fall far short of specifying, as the SEC must, Defendants' knowledge of facts or information contradicting their public statements.  *Maloney*, 518 F. Supp. 3d at 780–81; *see also SEC v. Solow*, 2007 WL 917269 at *2–3 (S.D. Fla. Mar. 23, 2007) (noting elements of securities fraud include scienter and that complaint may have contained sufficient particularity to sustain claims, but dismissing because its shotgun pleading did not give defendant adequate notice).

Tellingly, the Complaint does not cite a single email, OnPassive memoranda, or any other internal document in which Mr. Mufareh even questioned OnPassive's ability to release products in line with his projections, its legality, or any other topic on which the SEC attempts to build its claims.  Nor does the Complaint include assertions by any OnPassive employee or any other witness to establish that any of Mr. Mufareh's statements were untrue or that tend to show that he did not have a good faith belief that he was operating OnPassive lawfully.  *See SEC v. Yuen*, 221 F.R.D. 631, 637 (C.D. Cal. 2004) (granting motion to dismiss, remarking on the SEC's pleading failures in light of its "substantial pre-filing investigatory powers").  Surely, after a three-year SEC investigation, the Complaint would cite to such evidence if it existed.  There simply is no such evidence, and it certainly is not alleged.

Second, the Complaint does not adequately allege scienter based on

motive and opportunity.  At most, it alleges that Mr. Mufareh "used funds to further the pyramid scheme and for his and his spouse's personal use."  ¶ 16.  The SEC alleges that the "personal use" came in the form of transferring unspecified amounts of money into Mr. Mufareh and his wife's personal accounts and converting "a considerable portion" of funds generated from the business into crypto assets under his personal control to use on personal expenses—again in an unspecified amount.  ¶ 16.  But vague allegations that plead nothing more than an executive taking a salary for his efforts are insufficient to plead scienter.  Courts routinely find that motives common to all corporate executives, such as protecting compensation, are inadequate to plead scienter.  *See, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *see also Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.,* 595 F. Supp. 2d 1253, 1275 (M.D. Fla. 2009) ("Receipt of a standard incentive-based bonus has limited probative value for scienter.") *aff'd*, 594 F.3d 783 (11th Cir. 2010).

### C.   The Complaint Does Not State A Claim For Unjust Enrichment Against Asmahan Mufareh.

Asmahan Mufareh has no place in this case.  She is named only as a "Relief Defendant,"[15] and none of the allegations support the claim for unjust enrichment (Claim V) alleged against her.

---

[15] A relief defendant is someone who has not been accused of wrongdoing but rather has been joined in an action to aid in recovery on the assumption that she has "no ownership interest in the property that is the subject of litigation." *SEC v. Founding Partners Cap. Mgmt.*, 639 F. Supp. 2d 1291, 1293 (M.D. Fla. 2009).

To state a claim for unjust enrichment, the Complaint must plead that Mrs. Mufareh (i) received ill-gotten funds (ii) without a legitimate claim to those funds. *Founding Partners Cap. Mgmt.*, 639 F. Supp. 2d at 1293. (noting "ill-gotten" refers to how the defendant—not the relief defendant—obtained the funds).

Even if the funds transferred to Mrs. Mufareh were "ill-gotten" (and they are not), the Complaint does not state a claim because it does not adequately plead facts to support its conclusory allegation that she "does not have a legitimate claim" to them.  ¶ 16; *see also Founding Partners Cap. Mgmt.*, 639 F. Supp. 2d at 1293–94 (a "legitimate claim" can be subordinate to other ownership claims to funds and yet still "preclude [the individual] from being a proper relief defendant"); *cf. SEC v. Pegasus Wireless Corp.*, 2009 WL 3047223, at *2 (N.D. Cal. Sept. 21, 2009) (denying motion to dismiss where complaint alleged exact amount of transfers of ill-gotten gains, the account to which those funds were transferred, and how the relief defendant used those funds).

Mrs. Mufareh is a co-founder and co-owner of OnPassive.  ¶ 22.  There is nothing in the Complaint to suggest that the funds were anything other than routine compensation to a founder or a dividend to an owner, let alone that would undermine the inference that she has a legitimate claim to them. Further, the Complaint's allegations about how the Mufarehs used money from OnPassive are entirely consistent with them taking salaries or dividends based

on their roles at OnPassive—and inconsistent with taking money to which they are not entitled.   Although the Complaint alleges that they converted an unspecified amount[16] of OnPassive funds into crypto assets, the substance of the allegation is that they used the funds to purchase unremarkable, everyday items like "groceries," "online retail purchases," and "TV subscriptions."   ¶ 16. In other words, they received compensation for their efforts to build the business so that they could support their family.

Accordingly, the Court should dismiss Claim V.

## V.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

---

[16] Notably, the SEC does not attempt to quantify the amount of money that the Mufarehs supposedly took from OnPassive relying instead on vague and imprecise terms, such as "considerable," "sizeable," and "substantial."  ¶¶ 16, 86.  Surely if the amount was significant relative to the total $108 million that OnPassive allegedly raised from Founders, *see* ¶ 13, the SEC would have alleged as much.

Dated: October 16, 2023                Respectfully submitted,

                                       */s/ Christopher Garcia*
                                       Christopher Garcia (*pro hac vice*)
                                       William O. Reckler (*pro hac vice*)
                                       Alexis Kellert Godfrey (*pro hac vice*)
                                       LATHAM & WATKINS LLP
                                       1271 Avenue of the Americas
                                       New York, NY 10020
                                       Telephone: (212) 906-1200
                                       Facsimile: (212) 751-4864
                                       Email:  christopher.garcia@lw.com
                                               william.reckler@lw.com
                                               alexis.godfrey@lw.com

                                       John E. Clabby
                                       Carlton Fields, P.A.
                                       4221 West Boy Scout Boulevard
                                       Suite 1000
                                       Tampa, Florida 33607
                                       (813) 223-7000
                                       jclabby@carltonfields.com

                                       Jason A. Perkins
                                       Carlton Fields, P.A.
                                       200 S. Orange Avenue, Ste. 1000
                                       Orlando, Florida 32801
                                       (407) 849-0300
                                       jperkins@carltonfields.com

                                       *Attorneys for Defendants*
                                       *Ashraf Mufareh, OnPassive LLC, and*
                                       *Asmahan Mufareh*

## LOCAL RULE 3.01(g) CERTIFICATION

I hereby certify that counsel for Defendants has conferred over teleconference with SEC counsel, Gregory Miller and James Carlson, on September 15, 2023, who advised that the SEC opposes the relief requested herein.

*/s/ Christopher Garcia*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of October, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all parties of record.

*/s/ Christopher Garcia*