# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 6:23-cv-01539-PGB-RMN** |
| **ASHRAF MUFAREH, ONPASSIVE LLC, and ASMAHAN MUFAREH,** | |
| **Defendants.** | |

## <u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>

TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................1

II.   BACKGROUND ................................................................4

III.  LEGAL STANDARD ..........................................................6

IV.   ARGUMENT ...................................................................7

    A.   The Amended Complaint Should Be Dismissed As An
        Impermissible Shotgun Pleading. ..........................................7

    B.   The Amended Complaint Fails To State A Claim For
        Violations Of The Antifraud Provisions Of The Securities
        Act And The Securities And Exchange Act. ............................9

        1.   The Amended Complaint Does Not Allege An
            Actionable Misstatement Or Omission................................9

            a.   Statements About OnPassive's Legality Are
                Not Actionable...........................................................10

            b.   Statements About The Timing Of Product
                Launch Are Not Actionable. ........................................12

            c.   Statements About Potential Income
                Opportunities As An OnPassive Customer Are
                Not Actionable...........................................................16

            2.   The SEC Fails To Plead Conduct To Support The
               Existence Of Any Scheme To Defraud............................18

            3.   The Amended Complaint Fails to Allege Scienter
               Adequately.................................................................20

    C.   The Amended Complaint Does Not State A Claim For
        Unjust Enrichment Against Asmahan Mufareh.......................23

V.    The AC Should be Dismissed With Prejudice .......................... 25

TABLE OF AUTHORITIES

Page(s)

## CASES

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .................................................................. 6, 7

*Barmapov v. Amuial,*
  986 F.3d 1321 (11th Cir. 2021) .............................................. 7, 8

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................7

*Carlucci v. Han,*
  886 F. Supp. 2d 497 (E.D. Va. 2012) .......................................... 17

*Carvelli v. Ocwen Fin. Corp.,*
  934 F.3d 1307 (11th Cir. 2019) .......................................... 11, 12

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.,*
  129 F. Supp. 3d 48 (S.D.N.Y. 2015) .......................................... 10

*De Ford v. Koutoulas,*
  2022 WL 19842617 (M.D. Fla. July 11, 2022) (Byron, J.) .......... 18

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.,*
  595 F. Supp. 2d 1253 (M.D. Fla. 2009) *aff'd,* 594 F.3d 783
  (11th Cir. 2010) .......................................................................... 23

*Eiber Radiology Inc. v. Toshiba Am. Med. Sys. Inc.,*
  673 F. App'x 925 (11th Cir. Dec. 20, 2016) ................................ 25

*Griffin Indus., Inc. v. Irvin,*
  496 F.3d 1189 (11th Cir. 2007) .................................................. 20

*Hinkle v. Cont'l Motors, Inc.,*
  2017 WL 3131465 (M.D. Fla. July 24, 2017) ................................7

*Horne v. Potter,*
  392 F. App'x 800 (11th Cir. 2010) .............................................. 19

*Kalnit v. Eichler,*
  264 F.3d 131 (2d Cir. 2001) ...................................................... 23

TABLE OF AUTHORITIES

<u>Page(s)</u>

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d. 772 (S.D.N.Y. 2021) ................................................... 21, 22

*Meide v. Pulse Evolution Corp.*,
  2020 WL 5350325 (M.D. Fla. Sept. 4, 2020) ................................................ 16

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ................................................................ 7

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
  Fund*,
  575 U.S. 175 (2015) ........................................................... 10, 11, 13

*S.-Owners Ins. Co. v. Waterhouse Corp.*,
  2022 WL 20677887 (M.D. Fla. July 25, 2022) ........................................... 19

*SEC v. Founding Partners Cap. Mgmt.*,
  639 F. Supp. 2d 1291 (M.D. Fla. 2009) ................................................... 23, 24

*SEC v. Hwang*,
  2023 WL 6124041 (S.D.N.Y. Sept. 19, 2023) ............................................ 21

*SEC v. Roanoke Tech. Corp.*,
  2006 WL 3813755 (M.D. Fla. Dec. 26, 2006) ................................ 7, 9, 12, 18

*SEC v. Solow*,
  2007 WL 917269 (S.D. Fla. Mar. 23, 2007) ................................................ 22

*SEC v. Spinosa*,
  31 F. Supp. 3d 1371 (S.D. Fla. 2014) ....................................................... 21

*SEC v. Yuen*,
  221 F.R.D. 631 (C.D. Cal. 2004) ............................................................... 22

*SFM Holdings, Ltd. v. Banc of Am. Sec.*,
  *LLC*, 600 F.3d 1334 (11th Cir. 2010) ....................................................... 18

*In re Sportsline.com Sec. Litig.*,
  366 F. Supp. 2d 1159 (S.D. Fla. 2004) ....................................................... 21

*In re Teladoc Health, Inc. Sec. Litig.*,
  2023 WL 4351455 (S.D.N.Y. July 5, 2023) ................................................ 11

TABLE OF AUTHORITIES

Page(s)

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007).........................................................17

*Williams v. MJC Acquisition, LLC*,
  2020 WL 597464 (S.D. W. Va. Feb. 6, 2020)..............................................18

*Zelinski v. Securian Fin. Grp., Inc.*,
  2020 WL 3270605 (M.D. Fla. June 17, 2020)................................................9

**STATUTES**

15 U.S.C. 77e...........................................................................................................1

**RULES**

Fed. R. Civ. P. 9(b) ................................................................................. 7, 18, 21

Fed. R. Civ. P. 10(b) ..............................................................................................8

Rule 10b-5(b) ...........................................................................................................8

**OTHER AUTHORITIES**

*Beware of Pyramid Schemes Posing as Multi-Level Marketing
  Programs,* U.S. Securities and Exchange Commission (Oct. 1,
  2013), https://www.sec.gov/oiea/investor-alerts-
  bulletins/investor-alerts-ia-pyramid..................................................... 19, 20

Defendants Ashraf Mufareh and OnPassive LLC, and Relief Defendant Asmahan Mufareh, respectfully submit this memorandum of law in support of their motion to dismiss the Securities and Exchange Commission's Amended Complaint for Permanent Injunctive and Other Relief (ECF No. 26) in full as a "shotgun" pleading. In the alternative, they move to dismiss Claims II, III, and V[1] of the Amended Complaint for failure to state a claim.

## I.    INTRODUCTION

Mr. and Mrs. Mufareh founded OnPassive in 2018 to develop a marketing tool for online businesses. OnPassive later pivoted to creating a suite of software products that includes email, video conferencing, and social networking. OnPassive's vision is to integrate these services and others into a single ecosystem that meets users' communication, shopping, entertainment, and business needs. OnPassive's team of engineers has had success pursuing this vision, having designed and launched several products.

Like the SEC's original pleading, the Amended Complaint (the "AC") takes aim at the Mufarehs and OnPassive in two principal ways. It attacks OnPassive's business model, alleging that it is based on the unregistered sale

---

[1] Although Defendants do not move to dismiss Claim I of the Amended Complaint, which alleges violations of Sections 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. 77e—except to the extent that the entire Amended Complaint is a "shotgun" pleading—they deny that they offered or sold securities and are confident that the SEC will be unable to prove its claim. Because Defendants do not move against all alleged false statements, *see infra* n.3, Defendants similarly do not move to dismiss Claim IV, which alleges control person liability. Defendants deny any control person liability.

of securities and operates as a "pyramid scheme."  It further alleges that certain statements by Mr. Mufareh were intentional misstatements.  The AC fails to state a claim for fraud with respect to either OnPassive's business model or all but one category of those statements.

Notwithstanding the SEC's superficial edits to its initial pleading, the AC constitutes a "shotgun" pleading that fails to provide adequate notice as to how its allegations relate to its claims.  The AC does not specify whether it challenges statements concerning OnPassive's business model as false or misleading, or instead relies on those statements solely to support claims for the unregistered sale of securities and for scheme liability.

The AC's fraud claims should also be dismissed because the allegations concerning OnPassive's business model describe nothing other than the type of multi-level marketing program ("MLM") that courts routinely find lawful. The AC alleges that, for a fee of $97, OnPassive offered early adopters of its technology, known as "Founders," access to webinars and other informational materials, early access to products, and the opportunity to earn commissions as "Resellers" of those products.  Critically, the AC still does not allege (because it cannot) that the Founders were to be paid based exclusively on the sale of Founder positions.  Allowing early adopters the opportunity to earn commissions by facilitating sales of actual products is a classic, and legal, MLM.  Repeatedly calling OnPassive a "pyramid scheme," while inflammatory,

2

does not state a claim for fraud.

The AC similarly fails to state a claim with respect to the following allegedly false statements:

- The AC alleges that Defendants falsely claimed that OnPassive operated legally but fails to allege, as it must, that they did not believe those statements or that the statements contained false statements of embedded fact.

- The AC alleges that Defendants made misstatements about when OnPassive products would launch. But it does not allege that definitive dates were not met. Instead, far from offering a specific timeline, the alleged misstatements include the type of qualifying language one would expect of product development progress updates. Nor does the AC allege, as it must, that Mr. Mufareh did not believe that his statements were true.[2]

- The AC alleges that Defendants made false statements about the amount of money OnPassive customers could potentially earn, but those alleged statements are inactionable puffery.

In short, none of these statements constitute an actionable misstatement or omission sufficient to state a claim for securities fraud.[3]

The Section 17(a)(1) and Rule 10b-5 fraud claims should also be

---

[2] The AC does not allege that OnPassive failed to launch products. Instead, the AC is predicated on the SEC's apparent conclusion that OnPassive did not launch products quickly enough. The SEC ignores the realities of product development delays common to internet startups and does not appreciate that alleging that a product was not delivered on time does not, in itself, state a securities fraud claim.

[3] The AC also alleges that Defendants made false statements by creating websites with positive reviews of OnPassive without disclosing OnPassive's affiliation with those websites. While Defendants deny these allegations and expect to be vindicated on the merits after discovery, they are not the subject of this motion (except to the extent the entire AC is dismissed as a "shotgun" pleading).

dismissed because the AC does not adequately allege scienter.[4] It contains no facts that show conscious misbehavior or recklessness, or motive and opportunity. Indeed, the only facts alleged about money obtained from the business by Mr. Mufareh are entirely consistent with the level of compensation legitimately paid to the founder of a founder-run business.

Finally, the AC fails to state a claim for unjust enrichment against Mrs. Mufareh because it does not allege that she lacked a legitimate interest in the unspecified amount of funds transferred into accounts in her name.

Accordingly, in addition to being a deficient "shotgun" pleading, the AC fails to state a claim with respect to Claims II, III and V.

## II.    BACKGROUND

Mr. Mufareh founded OnPassive to develop an artificial intelligence-driven marketing tool. ¶¶ 2, 41. In September 2018, he retained an information technology firm (and later in-house IT personnel) to operationalize his vision. ¶ 76. But OnPassive soon pivoted, as many startups do. The following year, it began developing a full suite of software as a service ("SaaS") products, including email, video conferencing, and social networking. ¶ 43. Between August 2019 and December 2021, OnPassive's development

---

[4] Plaintiffs' claims based on Section 17(a)(2) and 17(a)(3) (parts of Claim II) do not require scienter. Accordingly, Defendants do not move to dismiss those claims for lack of scienter, although they do move to dismiss on the other grounds set forth in this motion.

pipeline nearly doubled from 30 applications to over 50.  ¶ 42.  Unlike most startups that offer a single product or standalone products, OnPassive aimed to have all its products work together in a seamless ecosystem.  ¶¶ 2, 76.

OnPassive's first product was a private website called the "Back Office." ¶¶ 27, 76.  The Back Office is the backbone of the OnPassive ecosystem, providing information about OnPassive and its products through webinars and other digital media.  ¶¶ 27, 28, 73(f).  The first users of the Back Office were early adopters of OnPassive, known as "Founders."  ¶ 24.  Founders paid $97 for access to the Back Office, early access to OnPassive's products, and the opportunity to become "Resellers" of those products.  ¶¶ 24, 25, 48.

In August 2020, OnPassive launched two additional products for the Founders' early use: O-Tracker (a real-time tool to optimize website performance by tracking key metrics and trends) and O-Trim (a web address (URL) shortener to simplify sending URLs across social media).  ¶ 76.  Then, in November 2022, OnPassive launched two cornerstones of the OnPassive ecosystem: O-Mail (an email service) and O-Net (a social media platform). ¶ 78.  By June 30, 2023, OnPassive had also released O-Chat (a tech support platform) and O-Connect (video communication software).  *Id.*

OnPassive launched some products free of charge, but Mr. Mufareh planned to release most using an SaaS model in which customers would pay a monthly fee.  ¶ 43.  He also planned to deploy an MLM structure, where

Founders or other individuals could purchase a product package and elect to become Resellers. ¶¶ 22, 48, 51. Resellers would then earn commissions on their own direct sales of products and on indirect sales by other Resellers that they recruited. ¶¶ 25, 34, 58. Resellers can also be Founders (and *vice versa*), but membership in one group does not require participation in the other. ¶ 25.

If Founders chose to become Resellers, their $97 Founder's fee would have earned them a higher placement in the potential commissions structure. ¶¶ 4, 25, 54. However, payment of that fee did not guarantee Founders any commissions. Commissions were to be based solely on the sale of software products. ¶¶ 24, 34, 49. Given that earning a commission required product sales, OnPassive made clear that "success with ONPASSIVE requires hard work, commitment, leadership and desire." ¶ 60. OnPassive never launched the reselling program and never paid commissions. ¶¶ 16, 78.

After issuing subpoenas and investigating for almost three years, the SEC filed this case alleging Defendants made false or misleading statements about the legality of OnPassive, the timing of product launches, positive website reviews, and income opportunities for Founders. *See* ¶¶ 59–63, 68–90.

## III. LEGAL STANDARD

A complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[5]

Plaintiffs cannot simply include formulaic recitations of the elements of a cause

of action, *Twombly*, 550 U.S. at 555, and the Court need not accept "legal

conclusions," "naked assertions," "mere conclusory statements," or inferences

without "facial plausibility." *Iqbal*, 556 U.S. at 677–78. Rather, "a complaint

must contain sufficient factual matter" to allow "the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."

*Hinkle v. Cont'l Motors, Inc.*, 2017 WL 3131465, at *2 (M.D. Fla. July 24, 2017).

Securities fraud claims—like those alleged here—are subject to the

heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil

Procedure. *SEC v. Roanoke Tech. Corp.*, 2006 WL 3813755, at *3 (M.D. Fla.

Dec. 26, 2006). Rule 9(b) requires plaintiffs to "state with particularity the

circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), including

the "who, what, when, where, and how of the allegedly false statements."

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

## IV. ARGUMENT

### A. The Amended Complaint Should Be Dismissed As An Impermissible Shotgun Pleading.

The AC constitutes a classic "shotgun" pleading for which courts in the

Eleventh Circuit have "little tolerance." *Barmapov v. Amuial,* 986 F.3d 1321,

---

[5] Unless otherwise indicated, all internal citations and quotation marks are omitted.

1325 (11th Cir. 2021). The prohibition against "shotgun" pleading is rooted in Federal Rule of Civil Procedure 10(b), which requires a party to "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). Simply put, Defendants must have adequate notice of the claims against them so that they can frame a responsive pleading, and the court must be able to discern whether the plaintiff has stated any claim for relief. *Barmapov*, 986 F.3d at 1324.

The AC—like the initial complaint—falls squarely within the definition of a "shotgun" pleading in that it is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Barmapov*, 986 F.3d at 1325. Instead of curing that defect, the SEC doubled down in the AC. Four of five Claims for Relief incorporate virtually all of the general factual allegations contained in the AC's first 99 paragraphs and then simply state the elements of the cause of action.[6] *See* ¶¶ 100–17.

The AC fails to specify whether it challenges statements concerning OnPassive's business model and income opportunities as false or misleading pursuant to Section 17(a)(2) of the Securities Act (Claim II) and/or under Rule 10b-5(b) (Claim III). On the one hand, the AC alleges that each of the

---

[6] The fraud claims (Claims II and III) incorporate all but seven of the first 99 paragraphs of the AC, ¶¶ 105–10, and the control person claim (Claim IV) and the unjust enrichment claim (Claim V) incorporate all but six, AC ¶¶ 111–17.

statements contained in Paragraphs 59 through 63 concerning the income opportunities were false or misleading.  ¶¶ 64, 68.  Yet it does not identify Paragraphs 59, 61, and 62 in its statement of the bases for its fraud-related claims predicated on misstatements or omissions (Claims II and III). ¶¶ 106(b), 109(b).  As a result, Defendants do not know whether the allegations are intended to support those claims, and the AC should be dismissed in its entirety.  *See Zelinski v. Securian Fin. Grp., Inc.*, 2020 WL 3270605, at *2 (M.D. Fla. June 17, 2020) (dismissing "shotgun" pleading where "each count fails to identify . . . which material facts supports each claim" and instead provided "a few barebone statements setting forth the elements for each cause of action.").

**B.    The Amended Complaint Fails To State A Claim For Violations Of The Antifraud Provisions Of The Securities Act And The Securities And Exchange Act.**

To state a claim for fraud under the Securities Act and the Securities and Exchange Act of 1934 (Claims II and III), the AC must plead either (1) a material misrepresentation or omission or (2) a deceptive act in furtherance of the alleged scheme to defraud.  *Roanoke Tech. Corp.*, 2006 WL 3813755, at *2– 3.  It does neither.  The AC also fails because it does not plead scienter in support of its Section 17(a)(1) and Rule 10b-5 claims.  ¶¶ 105–10.

**1.    The Amended Complaint Does Not Allege An Actionable Misstatement Or Omission.**

The SEC bases its fraud claims in part on the supposedly false or

misleading statements about: (1) OnPassive's legality, (2) the timing of its product releases, and (3) the potential income opportunities for Founders. *See* ¶¶ 59–64, 69–80.  None are actionable under the securities laws.

a.  Statements About OnPassive's Legality Are Not Actionable.

The AC challenges statements commenting on OnPassive's legality, such as: "WE ARE FULLY LEGAL-WORLDWIDE."[7] ¶¶ 70(a)–(c).  Notwithstanding the SEC's bare assertion to the contrary, ¶ 70, such statements constitute opinions and are not an adequate basis for a securities fraud claim.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189–91, 194–95 (2015); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 81–82 (S.D.N.Y. 2015).

Statements of opinion are only actionable where plaintiffs adequately allege that (1) the "speaker did not hold the belief she professed"; (2) "the supporting fact[s] she supplied were untrue"; or (3) the speaker "omits material facts" that make the statements misleading.  *See Omnicare*, 575 U.S. at 185–89.  The SEC has failed to allege facts that satisfy any of these prongs.

First, the SEC fails to allege that Mr. Mufareh "did not hold the belief [he] professed."  *Omnicare*, 575 U.S. at 186.  The AC never alleges that Mr.

---

[7] The AC also alleges that e-books contained the statements "WE ARE FULLY COMPLIANT-WORLDWIDE"; and "WE WILL NOT be shut down by a government; THEY WILL USE OUR PRODUCTS!"  ¶ 70(c).

10

Mufareh did not believe that OnPassive was compliant with the law, let alone any particularized facts to support such an allegation. Its bare assertions that Defendants "knew or were reckless in not knowing that they were operating an unlawful pyramid scheme," ¶ 69, and that Mr. Mufareh's "entire course of dealings . . . reflect his awareness that ONPASSIVE is an illegal pyramid scheme," ¶ 72, are conclusory and come nowhere close to satisfying this burden. *Omnicare*, 575 U.S. at 185–89. Indeed, the AC does not allege what about Mr. Mufareh's "course of dealings" demonstrates knowledge that OnPassive was *not* legally compliant.

Second, the AC does not identify any embedded "supporting fact" that was untrue, let alone explain why it was untrue. *See* ¶¶ 69–72; *Omnicare*, 575 U.S. at 185–86; *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1323 (11th Cir. 2019) (affirming dismissal where plaintiff failed to allege that challenged statements contained embedded false facts); *In re Teladoc Health, Inc. Sec. Litig.*, 2023 WL 4351455 at *8-9 (S.D.N.Y. July 5, 2023) (dismissing where plaintiffs failed to plead that embedded statements were false or misleading).

Third, the AC lacks any allegations that Defendants omitted facts that would make the statements misleading to a reasonable person.

Moreover, Mr. Mufareh's statement that OnPassive would not be shut down because "[the Government] will use [OnPassive's] products," ¶ 70(c), is inactionable puffery. No person could reasonably interpret the statement to

be an assertion that the government had entered into an agreement to use OnPassive's products. *See Carvelli*, 934 F.3d at 1318–22 (some statements "are just too boosterish to justify reasonable reliance" and are thus immaterial).

> b. Statements About The Timing Of Product Launch Are Not Actionable.

The AC challenges seven statements that Mr. Mufareh and OnPassive allegedly made about the anticipated timing for the launch of OnPassive's products. ¶¶ 73(a)–(h). Even accepting the SEC's allegations as true, none of the challenged statements supports a claim for securities fraud.

First, a majority of the statements do not promise to launch products on any specific date. *E.g.*, ¶¶ 73(b)–(e). Accordingly, they cannot be false or misleading in that regard. *See Roanoke*, 2006 WL 3813755, at *2–3. Rather, the following statements are just updates on OnPassive's progress, and the AC does not plead facts that demonstrate those updates were false or misleading:

| No. | Date[8] | Statement | Citation |
|-----|---------|-----------|----------|
| 1 | 9/25/2018 | "We're closer to launch, we're in the second half, maybe the last third, and you do the math . . . *I don't have a date*, I'm going to touch up on that respectfully, is it realistic to launch in the next 30 days? *Very much possible* I would say okay." | ¶ 73(b) |
| 2 | 10/3/2018 | "*We are definitely closer to the launch than when we announced this concept* let's say in the past, so we're clearly in the probably last third or quarter maybe." | ¶ 73(c) |
| 3 | 4/25/2019 | "In June we will have a kick start party in Orlando. Last weekend of June. Celebrate launch or opening *whether it's already open or getting tested just ready to* | ¶ 73(d) |

---

[8] Dates and statements reflect allegations in the AC. *See* ¶¶ 73(a)–(h). Emphases are added.

| | | *launch.*" | |
|---|---|---|---|
| 4 | 3/26/2020 | "ONPASSIVE is going to launch . . . it is everything *looking good for* 2020." | ¶ 73(e) |

In Statement No. 1, Mr. Mufareh expressly states "I don't have a date [to launch products]," ¶ 73(b), which is the opposite of promising a date certain. He also explains that while OnPassive was "closer to launch," an actual launch in the near future remained "possible" but not certain. *Id.* The AC does not allege any facts that contradict those statements.

The assertion in Statement No. 2 that OnPassive was "closer" to launch is similar in that all it says is that OnPassive had made progress since announcing its concept. ¶ 73(c). That is a low bar, and nothing in the AC suggests that it had not. Moreover, the notion in Statements Nos. 1 and 2 that OnPassive was "closer" is an opinion, and nothing in the AC supports an inference that Mr. Mufareh did not genuinely believe it. *See Omnicare*, 575 U.S. at 185–89. Indeed, the AC alleges that, by the time of the statements, OnPassive had retained an outside IT firm to develop the product, which is consistent with being closer to launch. ¶ 76. Although Statement No. 1 says that "we're in the second half, maybe the last third" and Statement No. 2 also says that "we're clearly in the probably last third or quarter maybe," it is unclear if that means that launch would be in the second half or third quarter of the year or of OnPassive's development cycle, and nothing in the AC suggests that either formulation was untrue. Moreover, Statement No. 2 itself includes

the qualifiers "probably" and "maybe," which explicitly acknowledges that the projection was uncertain, undermining any alleged falsity. Nor does the AC's allegation that "development of *most* of the 30 applications that were to comprise the ecosystem" had not commenced by August 2020, ¶ 76, support an inference that any statement was false. The AC does not allege that no products were in development at the time each statement was made, nor does it allege that no products could be launched within any particular timeframe. More generally, the AC does not allege that any Defendant promised that launch would involve the simultaneous commercial release of any specific number of products. To the contrary, the SEC admits that the nature and number of anticipated products changed over time, ¶¶ 29, 42, and OnPassive completed certain products ahead of others, ¶ 76.

Statement No. 3 adds no clarity to the launch timeline. ¶ 73(d). It merely says that OnPassive would hold a party to celebrate "whether it's already open *or getting tested.*" ¶ 73(d) (emphasis added).

Finally, Statement No. 4, made with nine months left in 2020, remarks that everything was "looking good" for launch later in the year. ¶ 73(e). It does not promise that launch would happen, and the AC does not allege facts demonstrating that things were not "looking good." Indeed, Mr. Mufareh's statement was nothing more than an opinion, and—as with the other opinion statements—there are no allegations that his belief was not genuine.

14

Second, the AC fails to allege that Mr. Mufareh did not genuinely believe the balance of the challenged statements that are all opinions about product timing.  Those statements are:

| No. | Date[9] | Statement | Cite |
|---|---|---|---|
| 5 | 7/17/2018 | "I [Mr. Mufareh] will send an update when the program launches *in about one month*." | ¶ 73(a) |
| 6 | 8/6/2020 8/31/2020– 10/31/2020 | "ONPASSIVE is scheduled and set to launch in 2020 . . . 2020 . . . *If we need more time we will let you know* right now.  We don't feel there's any uh necessary time to launch . . . *We have plenty of time for the remaining portion of unfinished part of ONPASSIVE to complete it in 2020*." | ¶¶ 73(f), (g) |
| 7 | 10/15/2020 | "realistically a few weeks" of testing [left].  "If now we are considered in pre-launch – how much more launch you want – like okay just that ribbon cutting?  It will happen.  *It's a done deal in my mind*, that's why I operate as we already have a multi-billion dollar business in every country on the planet." | ¶ 73(h) |

With respect to Statement No. 5, the AC fails to allege that Mr. Mufareh did not believe that OnPassive could launch a product "in about one month." ¶ 73(a).  While it does contend that Mr. Mufareh and his wife were the only people involved with OnPassive at the time, ¶ 75, it also alleges that OnPassive had retained an IT outsourcing firm by September 2018.  ¶ 76.  That undercuts any inference that Mr. Mufareh did not genuinely believe that OnPassive could launch in "about one month."[10]  ¶ 73(a).

---

[9] Dates and statements reflect allegations in the AC.  *See* ¶¶ 73(a)-(h).  Emphases are added.

[10] That belief was particularly reasonable given that, at the time, OnPassive was focused on developing a single marketing tool.  ¶ 41.  It did not expand its plans until 2020.  ¶ 42.

Similarly, with respect to Statement No. 6, the AC fails to plead facts to support an inference that, as of August 2020, there was not "plenty of time" for OnPassive to complete its work in the remaining four months of the year. ¶¶ 73(f), (g). Statement No. 6 also contemplates the possibility that the launch date could shift, saying, "[i]f we need more time we will let you know." *Id*. That undermines any allegation that the statement was false. And it makes sense. Delays reasonably flow from developing complicated software products, and companies need flexibility to make strategic decisions about when to "launch."

Finally, with respect to Statement No. 7, the AC fails to cite a single internal document, witness, or fact to contradict Mr. Mufareh's statement that "in [*his*] mind" launch was a "done deal." ¶ 73(h). That is egregious given the SEC's three-year pre-filing investigation and decision to amend its complaint.

>           c.    Statements About Potential Income Opportunities As
>                 An OnPassive Customer Are Not Actionable.

The AC alleges that the "most heavily marketed aspect" of the Founders program was the "potential size of the income opportunity," including alleged statements that it was possible under OnPassive's proposed "payment grid" for Founders to receive over $2 million per month. ¶¶ 59–63. But the AC mischaracterizes those statements, which were—at most—mere puffery. *See Meide v. Pulse Evolution Corp.*, 2020 WL 5350325, at *13 (M.D. Fla. Sept. 4, 2020) (puffery where statements are of the kind "which no sensible man takes

seriously, and if he does he suffers from his credulity"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) (puffery if statements are "corporate optimism on which no reasonable investor would rely").

No reasonable person would view the reference to $2 million per month, for life, as an actual promise of potential commissions. *See Carlucci v. Han*, 886 F. Supp. 2d 497, 523–24 (E.D. Va. 2012) (statements that suggest exorbitant and atypical rates of return are non-actionable puffery). Accordingly, the "payment grid" cannot constitute an actionable misstatement.

Moreover, the AC's reliance on a "payment grid" (really an undated marketing picture) in Paragraph 60 and email cited in Paragraph 63 fail to state a claim because OnPassive included disclaimers in those documents, as it routinely did when making projections about income opportunities. The payment grid contains a clear statement saying that it is illustrative in nature. ¶ 60. It says: "Earnings vary depending on each individual affiliate's effort. The income claims presented are not intended to serve as a guarantee of income; instead, they're designed to give you an idea of what's possible. As with any business, success with ONPASSIVE requires hard work, commitment, leadership, and desire." *Id.* (emphasis added). That disclaimer and others like it undermine any allegation of falsity or materiality.[11]

---

[11] The SEC misleadingly presents only portions of the email referenced in Paragraph 63 of the AC, deliberately omitting a similar disclaimer that undercuts the inference that the

### 2.    The SEC Fails To Plead Conduct To Support The Existence Of Any Scheme To Defraud.

In lieu of alleging actionable false statements, the AC could theoretically state a claim for securities fraud under Section 17(a)(1) and (3) of the Securities Act and Rule 10b-5(a) and (c) of the Exchange Act if it pleaded some form of deceptive conduct. *See Roanoke*, 2006 WL 3813755, at *2–3. However, it is not at all clear from the face of the AC that the SEC has even attempted to do so. Indeed, as set forth above, the AC should be dismissed as a "shotgun" pleading that does not provide Defendants with adequate notice of the claims against them. *See De Ford v. Koutoulas*, 2022 WL 19842617, at *1 (M.D. Fla. July 11, 2022) (Byron, J.). Nonetheless, Defendants' best guess—which they should not have to make—is that the SEC plans to support its claim for scheme liability with its allegation that OnPassive is a "pyramid scheme." ¶¶ 10, 33. That conclusory allegation fails to satisfy Rule 9(b).

First, despite repeatedly using the label "pyramid scheme" for inflammatory effect, the AC fails to allege conduct that would render OnPassive's business inconsistent with that of a legal MLM. *See Williams v. MJC Acquisition, LLC*, 2020 WL 597464, at *4 (S.D. W. Va. Feb. 6, 2020)

---

email contains false statements. The disclaimer reads that the projections were for "ILLUSTRATION purpose[s] Only and in NO WAY a Guarantee of INCOME." Reckler Declaration Ex. 1. Moreover, that email is not about the sale of Founder positions—the basis for alleging securities fraud—but rather about the income prospects for all Resellers. *Id.*; *see SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) (courts may consider materials that are incorporated by reference into the complaint).

("Though it is easy enough to draw parallels . . . not all MLM businesses are illegal pyramid schemes.").   The securities laws do not define "pyramid schemes," let alone make them *per se* illegal.   Rather, the AC must plead with particularity the elements of a securities fraud claim, including a false statement or deceptive conduct.   It cannot substitute a colloquial, pejorative characterization in lieu of particularized facts that satisfy the elements.

Second, OnPassive's proposed business model does not meet the SEC's own definition of a "pyramid scheme."   The SEC has acknowledged a difference between legitimate MLMs in which participants "get paid for products or services that [they] and the distributors in [their] 'downline' . . . sell to others" and "pyramid schemes" that are "a type of fraud in which participants profit almost exclusively through recruiting other people to participate[.]"[12]   In the SEC's own words, an illegal "pyramid scheme" is an arrangement where "money from new participants is used to pay recruiting commissions . . . to earlier participants."[13]   Yet, the AC concedes that Founders were to be paid commissions based on the products they sold

---

[12] *Beware of Pyramid Schemes Posing as Multi-Level Marketing Programs,* U.S. Securities and Exchange Commission (Oct. 1, 2013), https://www.sec.gov/oiea/investor-alerts-bulletins/investor-alerts-ia-pyramid. "A district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment." *Horne v. Potter,* 392 F. App'x 800, 802 (11th Cir. 2010). "Because the above information derives from an official government website, the Court may take judicial notice of these facts." *S.-Owners Ins. Co. v. Waterhouse Corp.,* 2022 WL 20677887, at *11 n.14 (M.D. Fla. July 25, 2022).

[13] *Beware of Pyramid Schemes,* https://www.sec.gov (Oct. 1, 2013).

(whether directly or indirectly through others they recruited), not on the sale of Founder positions.  ¶ 25 (product purchases constituted "resales" and "a portion of the monthly subscription fees paid by customers" for resales would be paid as a commission).  This allegation cannot be undone by the AC's later, more general—and seemingly contradictory—allegation that OnPassive offered Founders " income not primarily for the sale of the product to ultimate users, but rather in return for recruiting other participant-recruiters."  ¶ 33; *see Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007) ("Our duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations.").  Moreover, it is not clear what this latter allegation means, as the AC never alleges that any portion of the $97 Founder's fee would be paid as commissions or that non-Founder Resellers were ever asked to pay for anything other than products.  Even if the two statements could be reconciled, the AC does not allege, as the SEC has taken the position it must, that Founders would profit "almost exclusively" by recruiting other Founders rather than from the sale of products.[14]

### 3. The Amended Complaint Fails to Allege Scienter Adequately.

The SEC's Section 17(a)(1) and Rule 10b-5 securities fraud claims

---

[14] *Beware of Pyramid Schemes*, https://www.sec.gov (Oct. 1, 2013).

(Claims II and III) also fail because the AC does not adequately allege that Defendants acted with scienter.

To establish scienter, the SEC must plead either (1) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" or (2) "facts to show that defendants had both motive and opportunity to commit fraud." *SEC v. Hwang*, 2023 WL 6124041, at *6 (S.D.N.Y. Sept. 19, 2023); *see also SEC v. Spinosa*, 31 F. Supp. 3d 1371, 1377–78 (S.D. Fla. 2014). Yet the AC merely repeats the same boilerplate conclusion that Mr. Mufareh "knew or was reckless in not knowing" that each of the categories of alleged misstatements were fraudulent. *See* ¶¶ 67, 69, 80, 89, 90. While Rule 9(b) permits a plaintiff to allege intent "generally," such conclusory allegations are insufficient unless accompanied by facts "giving rise to a strong inference of fraudulent intent." *Hwang*, 2023 WL 6124041, at *6. The AC contains none.

First, the AC cannot survive based on a recklessness-based theory of scienter, which requires a showing of an "extreme departure from the standards of ordinary care." *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1172 (S.D. Fla. 2004); *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 780 (S.D.N.Y. 2021).[15] The AC alleges that Mr. Mufareh's "entire course of dealings, as alleged in this Amended Complaint, reflect his

---

[15] To the extent the AC attempts to rely on circumstantial evidence of recklessness rather than motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater to support a finding of scienter." *Hwang*, 2023 WL 6124041, at *6.

awareness that ONPASSIVE is an illegal pyramid scheme." ¶ 72. However, the AC provides no facts to explain what this "course of dealings" was or why it indicates any such awareness. Such conclusory allegations fall far short of demonstrating Defendants' knowledge of facts or information contradicting their public statements. *Maloney*, 518 F. Supp. 3d at 780–81; *see also SEC v. Solow*, 2007 WL 917269 at *2–3 (S.D. Fla. Mar. 23, 2007) (complaint may have contained sufficient particularity to sustain claims, but dismissing because "shotgun" pleading did not give defendant adequate notice).

Despite taking the opportunity to amend its pleading, the SEC does not cite a single email, OnPassive memo, or any other document in which Mr. Mufareh even questioned OnPassive's ability to release products in line with his projections, its legality, or any other topic on which the SEC attempts to build its claims. Nor does the AC include assertions by any OnPassive employee or other witness to establish that any of Mr. Mufareh's statements were untrue. The sprinkling of buzzwords such as "reckless," ¶¶ 11, 69, 73, "scienter," ¶¶ 64, 80, and "knowing," ¶¶ 69, 73, cannot substitute for the necessary and specific factual allegations are that are absent. Surely, after a three-year investigation, the SEC would cite such evidence in the AC if it existed. *See SEC v. Yuen*, 221 F.R.D. 631, 637 (C.D. Cal. 2004) (granting motion to dismiss and, remarking on the SEC's pleading failures in light of its "substantial pre-filing investigatory powers"). It does not.

Second, the AC does not adequately allege scienter based on motive and opportunity.  It alleges that Mr. Mufareh used "funds to further the pyramid scheme and for his and his spouse's personal use" and that the "personal use" allegedly came in the form of transferring unspecified amounts of money into Mr. Mufareh and his wife's personal accounts and converting "a considerable portion" of funds generated from the business into crypto assets to use on personal expenses—again in an unspecified amount.  ¶ 17.  But vague allegations that plead nothing more than an executive taking a salary for his efforts are insufficient to plead scienter.  Courts routinely find that motives common to all executives, such as protecting compensation, are inadequate to plead scienter.  *See, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *see also Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.,* 595 F. Supp. 2d 1253, 1275 (M.D. Fla. 2009) ("Receipt of a standard incentive-based bonus has limited probative value for scienter.") *aff'd*, 594 F.3d 783 (11th Cir. 2010).

## C.  The Amended Complaint Does Not State A Claim For Unjust Enrichment Against Asmahan Mufareh.

Asmahan Mufareh is named only as a "Relief Defendant,"[16] and the allegations do not support the unjust enrichment claim (Claim V) against her.

To state a claim for unjust enrichment, the AC must plead that

---

[16] A relief defendant is someone who has not been accused of wrongdoing but rather has been joined in an action to aid in recovery on the assumption that she has "no ownership interest in the property that is the subject of litigation." *SEC v. Founding Partners Cap. Mgmt.*, 639 F. Supp. 2d 1291, 1293 (M.D. Fla. 2009).

Mrs. Mufareh (i) received ill-gotten funds (ii) without a legitimate claim. *Founding Partners Cap. Mgmt.*, 639 F. Supp. 2d at 1293 (noting "ill-gotten" refers to how the defendant—not the relief defendant—obtained the funds). Even if the funds transferred to Mrs. Mufareh were "ill-gotten" (and they are not), the AC does not state a claim because it does not plead facts to support its conclusory allegation that she "does not have a legitimate claim" to them. ¶ 17. Despite amending its complaint in lieu of responding to the initial motion to dismiss, the SEC did not provide any factual allegations to remedy this defect. *See Founding Partners Cap. Mgmt.*, 639 F. Supp. 2d at 1293–94 (a "legitimate claim" can be subordinate to other ownership claims to funds and yet still "preclude [the individual] from being a proper relief defendant").

Mrs. Mufareh is a co-founder and co-owner of OnPassive. ¶ 23. There are no allegations that she received anything other than routine compensation to a founder or a dividend to an owner, let alone allegations that would undermine the inference that she has a legitimate claim to those funds. The allegations about how the Mufarehs used money from OnPassive are consistent with their taking salaries or dividends, and inconsistent with fraud. Although the AC alleges that they converted an unspecified amount[17] of money

---

[17] The SEC does not even attempt to quantify the amount of money the Mufarehs supposedly took from OnPassive relying instead on vague and imprecise terms such as "considerable," "sizeable," and "substantial." ¶¶ 17, 98. Surely if the amount was significant relative to the $108 million OnPassive allegedly raised, *see* ¶ 14, the SEC would have alleged as much.

into crypto assets, the substance of the allegation is that they purchased unremarkable, everyday items like "groceries," "online retail purchases," and "TV subscriptions." ¶ 17. In other words, the Mufarehs received compensation for building a business and used it to support their family.

Accordingly, the Court should dismiss Claim V.

## V. THE AC SHOULD BE DISMISSED WITH PREJUDICE

The SEC investigated this matter for over three years, issuing subpoenas and using the full power imbued in it by Congress. It then filed a woefully defective complaint. When faced with Defendants' initial motion to dismiss, the SEC chose to take a second bite at the apple by amending its pleading in lieu of filing an opposition. The AC, however, is equally lacking and does not contain any new allegations sufficient to address the shortcomings identified by Defendants' initial motion to dismiss. The SEC should not be rewarded with a third bite at the apple and, for the foregoing reasons, the AC should be dismissed with prejudice. *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys. Inc.*, 673 F. App'x 925, 930 (11th Cir. Dec. 20, 2016) (affirming dismissal with prejudice because, "[w]e have never required district courts to grant counseled plaintiffs more than one opportunity to amend a deficient complaint, nor have we concluded that dismissal with prejudice is inappropriate where a counseled plaintiff has failed to cure a deficient pleading after having been offered ample opportunity to do so.").

Dated: November 20, 2023                Respectfully submitted,

_/s/ Christopher Garcia_
Christopher Garcia (*pro hac vice*)
William O. Reckler (*pro hac vice*)
Alexis Kellert Godfrey (*pro hac vice*)
Alexander L. Mills (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:   christopher.garcia@lw.com
         william.reckler@lw.com
         alexis.godfrey@lw.com
         alex.mills@lw.com

John E. Clabby
Carlton Fields, P.A.
4221 West Boy Scout Boulevard
Suite 1000
Tampa, Florida 33607
(813) 223-7000
jclabby@carltonfields.com

Jason A. Perkins
Carlton Fields, P.A.
200 S. Orange Avenue, Ste. 1000
Orlando, Florida 32801
(407) 849-0300
jperkins@carltonfields.com

*Attorneys for Defendants*
*Ashraf Mufareh, OnPassive LLC, and*
*Asmahan Mufareh*

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

I hereby certify that counsel for Defendants has conferred with SEC counsel, Gregory Miller, Michael Friedman, and James Carlson, on November 17, 2023, by email, who advised that the SEC opposes the relief requested herein.

*/s/ Christopher Garcia*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of November, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all parties of record.

*/s/ Christopher Garcia*