UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.                                  Case No: 6:23-cv-1539-JSS-RMN

ASHRAF MUFAREH, ONPASSIVE
LLC, and ASMAHAN MUFAREH,

      Defendants.

_____/

## ORDER

Defendants, Mr. Ashraf Mufareh and Mrs. Asmahan Mufareh and their company OnPassive LLC, move to dismiss the amended complaint filed by Plaintiff, the Securities and Exchange Commission (SEC). (Dkt. 32.) Defendants contend that the amended complaint is a shotgun pleading and that Counts II, III, and V fail to state a claim. (*Id.* at 12–30.) The SEC opposes the motion. (Dkt. 33.) Upon consideration, for the reasons outlined below, the court denies the motion.

## FACTS[1]

Mr. and Mrs. Mufareh are the co-owners and co-founders of OnPassive, an Orlando, Florida-based company that purports to "be developing a suite of computer applications using artificial intelligence [(AI)] that w[ill] seamlessly interface with one

---

[1] The court accepts the well-pleaded factual allegations in the amended complaint as true and construes them in the light most favorable to the SEC. *See Harry v. Marchant*, 291 F.3d 767, 769 (11th Cir. 2002) (en banc).

another in an 'ecosystem' similar to applications offered by established, well-known multinational technology companies." (Dkt. 26 ¶¶ 2, 21–22.)  To date, OnPassive has not "fully develop[ed]" or made "commercially available a suite of online computer applications." (*Id.* ¶ 37.)  Mr. Mufareh has been the Chief Executive Officer (CEO) of OnPassive since its November 19, 2018 formation and, as such, "has wholly controlled all [the company's] operations . . . and had ultimate authority over its activities." (*Id.* ¶¶ 2, 21–22, 75.)  Both Mr. and Mrs. Mufareh have benefited financially from OnPassive's activities. (*Id.* ¶¶ 23, 97–99.)

As OnPassive's CEO, Mr. Mufareh "solicited investors" for the company "using email and live webinars" that were "usually produced from [his] Orlando home." (*Id.* ¶ 38.)  The investment program that he employed is the focus of the SEC's claims. (*See id. passim.*)  The SEC alleges that Mr. Mufareh and OnPassive engaged in misconduct related to the investment program every year from 2018 to 2023. (*See id.*)

**A. 2018**

Beginning July 2018, Mr. Mufareh recruited investors for OnPassive. (*Id.* ¶ 37.)  He used a non-public website, which he called, "the Back Office," to "facilitate and track [his] recruitment efforts." (*Id.* ¶ 27.)  He referred to investors who registered through the Back Office as "Founders." (*Id.* ¶ 24.)  An investor who wanted to be a Founder was asked to pay a $97 fee. (*Id.* ¶ 6.)  Generally, Mr. Mufareh encouraged each investor to "purchase multiple $97 positions" in OnPassive's investment program "to increase the [investor]'s potential for income." (*Id.* ¶ 9.)  He "distinguished

between Founders [who] paid the $97" fee and "those [who] had not yet paid," describing the latter "as holding 'free' positions" in the program. (*Id.* ¶ 24.) Mr. Mufareh stated that he "could remove any Founder holding a 'free' position at any time" before OnPassive's suite of applications launched to consumers. (*Id.*) He further stated that he "would eliminate all . . . 'free' positions" by the suite's launch "so that only paying Founders would be eligible to maintain their positions." (*Id.*) Mr. Mufareh "claim[ed] that Founders would share in profits that would . . . come from monthly subscription fees paid by" the suite's users. (*Id.* ¶ 37.) He also claimed that Founders could "receive as a 'commission' a portion of" the fees paid by those who invested in OnPassive after them. (*Id.* ¶ 24.) To that end, he purportedly kept track of "the order in which [the Founders] registered." (*Id.*)

"Beginning on July 17, 2018[,] and continuing through at least October 2018, [Mr.] Mufareh composed and sent, or directed others to send, hundreds of emails to potential investors." (*Id.* ¶ 73a.) Each email stated that Mr. Mufareh "w[ould] send an update when the program launche[d]," which would occur "in about one month" from the date of the email. (*Id.*) Mr. Mufareh made this statement even though he and Mrs. Mufareh "were the only two persons involved with any aspect of [OnPassive]'s operations" and "neither had any expertise to develop a suite of computer applications using AI." (*Id.* ¶ 75.)

In September 2018, Mr. Mufareh "retained an information technology [(IT)] outsourcing firm" for OnPassive. (*Id.* ¶ 76.) "[A]t least during the first two years," this IT firm—and the in-house IT personnel that Mr. Mufareh subsequently hired—

focused on developing the Back Office rather than the applications that OnPassive was purportedly launching.  (*Id.*; *see also id.* ¶ 74 ("[A]t least up through August 2020, [Defendants hired personnel and expended resources] chiefly to develop [OnPassive]'s Back Office website used for recruiting new investors, tracking placement in [OnPassive's investment program], and marketing the [OnPassive] income opportunity.").)

On September 25, 2018, Mr. Mufareh participated in a live webinar for OnPassive, during which he stated that OnPassive was operating legally[2] and said, "We're closer to launch[.]  [W]e're in the second half, maybe the last third, and you do the math . . . I don't have a date[.]  I'm going to touch up on that respectfully[.]  [I]s it realistic to launch in the next [thirty] days?  Very much possible[,] I would say[,] okay."  (*Id.* ¶ 73b.)  Also during this webinar, Mr. Mufareh shared a payment grid entitled "All Monthly Residual[s] for Life," which showed that a Founder "could receive up to $2,032,614 per month for life . . . based on the . . . assumption that ten levels of recruits, comprising 88,573 commission-generating positions," would invest in OnPassive after the Founder.  (*Id.* ¶¶ 60–61.)  In addition to "stat[ing] that the grid showed how it was possible for [Founders] to receive over $2 million per month if up to ten tiers under them were fully populated," Mr. Mufareh "suggested [during the webinar] that $30 million per month was feasible if more than ten rows were

---

[2] To use the SEC's words, Mr. Mufareh stated during webinars dated September 25, 2018, July 18, 2019, and June 11, 2020, that OnPassive "was engaged in a legal business."  (Dkt. 26 ¶ 70a.)  These statements were posted to the Back Office.  (*Id.*)

populated." (*Id.* ¶ 61.)  A week later, during another live webinar, Mr. Mufareh said, "We are definitely closer to the launch than when we announced this concept[,] let's say[,] in the past, so we're clearly in the probably last third or quarter maybe."  (*Id.* ¶ 73c.)  The payment grid and recordings of these webinars were posted to the Back Office after the webinars.  (*Id.* ¶¶ 61, 70a, 73b–c.)

## B. 2019

"In early 2019, pre-existing and independently-operated third-party" websites aimed at reviewing multi-level marketing (MLM) programs "posted multiple negative reviews" of OnPassive and Mr. Mufareh.  (*Id.* ¶ 81.)  On January 7, 2019, a website posted a review stating: "[T]here's inherently nothing of particular interest with [OnPassive].  It's literally nothing more than a pyramid scheme launched by a serial scammer." (*Id.* ¶ 82a.)  On February 28, 2019, another website posted a review stating: "[OnPassive] is a scam, and here is our main reason why:  No retail products offered.  Sure[,] the company offers a[] [marketing] platform that you can gain access to, but only as an [MLM] affiliate member."  (*Id.* ¶ 82b (third, fourth, and fifth alterations in original).)   Mr. Mufareh initially responded to the negative reviews by advising investors to "ignore the haters."  (*Id.* ¶ 83.)

In April 2019, Mr. Mufareh "reviewed, edited, and authorized for posting to [the] Back Office" the following information about OnPassive's Founder positions:

> [W]hen you accept an Early Founder Position, you're placed in OnPassive's Top Leadership.  This is the top 1% of the leaders in the company and the teams under these leaders are built literally hands-free. . . . This is done through company-wide marketing campaigns using four or five of the world's best/largest data exchange companies to run

the campaigns.  These campaigns are "fed" using proprietary databases, developed and owned by OnPassive, that consist of leads incredibly targeted to specific industries.  Before the public launch, the primary purpose of the existing Founders and the company campaigns are to invite other Founders.  The Founders Positions are ranked according to (1) the date the Position was acquired, and (2) the number of paid Founders they have personally sponsored.

(*Id.* ¶ 45.)  Also in April 2019, Mr. Mufareh "reviewed, edited, and authorized for posting to [the] Back Office" the statements "We are fully legal—worldwide," "We are fully compliant—worldwide," and "We will not be shut down by a government; they will use our products!"  (*Id.* ¶ 70c (emphasis omitted).)  Mr. Mufareh repeated these three statements in December 2021.  (*Id.*)  On April 25, 2019, Mr. Mufareh participated in a live webinar, during which he said, "In June we will have a kick[]start party in Orlando.  Last weekend of June.  Celebrate launch or opening whether it's already open or getting tested just ready to launch."  (*Id.* ¶ 73d.)  A recording of this webinar was posted to the Back Office.  (*Id.*)

During an August 29, 2019 webinar, Mr. Mufareh stated that OnPassive "was 'legal' in every country in which it operated, or there would be 'workarounds' to make it legal."  (*Id.* ¶ 70b.)  Further, "[b]etween August 2019 and at least December 2021," Mr. Mufareh increased the number of applications that OnPassive would purportedly launch.  (*Id.* ¶ 42.)  The number began as approximately thirty but grew to over fifty.  (*Id.*)

In November 2019, because "negative reviews persisted" about OnPassive on MLM review websites, Mr. Mufareh allegedly "approved . . . the creation of counterfeit and intentionally misleading websites" that "mimick[ed] the names and

appearances of" the two websites that had posted the abovementioned negative reviews. (*Id.* ¶ 84.) The domain names of the "counterfeit sites" were nearly identical to those of the existing review websites. (*Id.* ¶ 84b.) One counterfeit site's name differed from its existing site's name only in that the counterfeit site's name ended in ".us" while the existing site's name ended in ".com." (*Id.*) The other counterfeit site's name differed from its existing site's name only in that the counterfeit site's name used a singular form while the existing site's name used a plural form. (*Id.*) In addition, each counterfeit site incorporated into its logo the name of the existing site that it was allegedly copying. (*Id.*) Mr. Mufareh "personally registered" the counterfeit sites but "pa[id] to have the sites registered under the name of a 'domain proxy,'" which, the SEC alleges, allowed him "to conceal his and [OnPassive]'s involvement" with the sites and "to deceive investors into thinking that the reviews posted on the . . . sites were objectively made by independent third parties." (*Id.* ¶ 84c.)

Mr. Mufareh used the counterfeit sites to publish positive reviews of OnPassive and himself. (*Id.* ¶ 84.) In addition, OnPassive employees posted on the counterfeit sites "reviews of other programs" and general advice about MLM programs—topics that existing MLM review websites typically covered. (*Id.* ¶ 84e.) According to the SEC, OnPassive employees proposed that "they would 'us[e] the[] two [counterfeit] sites as [third-party sites],' 'write . . . exclusive review[s] on [their] own brand (just like a [third person's] writing),' and use both counterfeit websites 'to influence the people,' with the 'first target assigned [being] to knock down [the existing sites] from the search results.'" (*Id.* ¶ 84a (first, third, fifth, and eighth alterations in original).) Mr. Mufareh

allegedly approved this proposal.  (*Id.*)  The "About" section of one of the counterfeit sites stated:

> Our only objective is to educate users who are searching for companies [including] MLM (primary target industry) . . . [We] summarize a company's overall status and reputation in the market.  These reviews could help any user to identify and decide whether to approach a company or not to for any business or professional reasons.

(*Id.* ¶ 84d (alterations in original).)  On November 30, 2019, a counterfeit site posted a review that recommended "be[ing] part of" OnPassive and stated that OnPassive was "scam-free, fully legit[,] and compliant" and "ha[d] a global presence in more than" one hundred countries.  (*Id.* ¶ 84f.)  Overall, OnPassive "personnel wrote and posted seven positive reviews" on one counterfeit site "between November 2019 and March 2020" and "six positive reviews" on the other counterfeit site "between December 2019 and March 2020."  (*Id.* ¶ 84f–g.)

## C.  2020

"In February 2020, [Mr.] Mufareh announced in a webinar posted to [the] Back Office that the target audience [for OnPassive] was being expanded to include anyone interested in using AI applications."  (*Id.* ¶ 42.)  He also "reviewed and approved for posting in the Back Office" an allegedly "false marketing message from a Founder with 'realistic,' 'conservative,' and 'worst case' scenarios."  (*Id.* ¶ 63.)  The message "projected [that] Founders would earn over $32 million" through OnPassive's investment program and "touted the purported income benefits of buying multiple positions" in the program.  (*Id.*)  On February 16, 2020, a counterfeit site posted a review stating:  "Why do I believe that [OnPassive] is responsible for taking my

business goals to heights, which I never thought I could? . . . With all of these advantages in front of my eyes, I couldn't stay blind and not plunge into becoming a member of [OnPassive]." (*Id.* ¶ 84g.)

In March, June, August, and October 2020, Mr. Mufareh made more statements about OnPassive during webinars posted to the Back Office. (*Id.* ¶¶ 73e, 73f, 73h, 87.) On March 26, 2020, he stated that OnPassive was "going to launch" and that "everything [was] looking good for 2020." (*Id.* ¶ 73e.) On June 11, 2020, he focused on the positive online reviews of OnPassive from the counterfeit sites and said that someone who saw them "was more likely to register for [OnPassive] and pay the $97 fee to become a Founder." (*Id.* ¶ 87.) On August 6, 2020, he reiterated that OnPassive was "scheduled and set to launch in 2020." (*Id.* ¶ 73f.) "If we need more time," he said, "we will let you know right now. We don't feel there's any . . . necessary time to launch. . . . We have plenty of time . . . to complete [the remaining portion] in 2020." (*Id.*) The 2020 launch date from the August 2020 webinar was repeated in six emails, which were "drafted by members of" OnPassive's leadership and "transmitted via [OnPassive]'s official email address to prospective and existing investors on various dates from August 31 through October 31, 2020." (*Id.* ¶ 73g.) On October 15, 2020, Mr. Mufareh "stated that all that was left was 'realistically a few weeks' of testing." (*Id.* ¶ 73h.) He added, "If now we are considered in pre-launch—how much more launch you want—like okay just that ribbon cutting? It will happen. It's a done deal in my mind[.] [T]hat's why I operate as we already have a multi-billion[-]dollar business in every country on the planet." (*Id.*)

Also, in August 2020, OnPassive officially announced that its suite "would include [thirty] software applications that would work together in an ecosystem." (*Id.* ¶ 76 (internal quotation marks omitted).) However, by the time of this announcement, OnPassive had not begun "development of most of the [thirty] applications that were to comprise the ecosystem." (*Id.*) Indeed, it "had completed only two[—]comparatively simple[—]software applications (an internet protocol address [(IP)] tracker and a uniform resource locator [(URL)] shortener), equivalents of which were already readily available to the public online for free." (*Id.*) Because OnPassive's purported plan was to launch "all applications simultaneously" as an ecosystem, OnPassive had not launched these two applications yet. (*Id.*)

## D. 2021

By December 2021, Mr. Mufareh had allegedly changed the participation requirements for OnPassive's investment program in three ways. (*Id.* ¶ 51.) "First, the monthly subscription fees would no longer be in the range of $25 [to] $900." (*Id.*) The fees would be "substantially higher" than those amounts, but the new pricing was "unspecified." (*Id.*) "Second, a Founder's $97 initial payment would no longer be deemed to cover the monthly subscription fees due during the first year following" the commercial rollout of OnPassive's suite of applications. (*Id.*) Instead, Founders would "have to pay a monthly subscription fee." (*Id.*) Third, every investor would have to check a box on OnPassive's website electing to be a "Reseller." (*Id.*) "There was no added cost for electing to be a 'Reseller,' and electing to be a 'Reseller' did not

obligate the electing person to do anything." (*Id.*)  Consistent with this requirement, a document "posted to [the] Back Office from December 2021 []to August 2022 stated that every Founder would elect to become a 'Reseller.'" (*Id.* ¶ 25.)

Another document posted to the Back Office from December 2021 to August 2022 discussed how a participant in OnPassive's investment program could profit by recruiting additional participants to the program.  (*Id.* ¶ 62.)  The document asserted that "a participant could have 'an infinite team' of downstream recruits from which the participant would draw commissions and earn 'unlimited residual income' 'for life.'" (*Id.*)  The document also "stated that a participant could earn thousands and even millions of dollars." (*Id.*)  Mr. Mufareh "reviewed and edited" the document and "authoriz[ed]" its publication through the Back Office.  (*Id.*)

### E.  2022

On June 22, 2022, OnPassive stopped accepting Founder registrations.  (*Id.* ¶¶ 3, 13, 24, 53.)  However, it "continued to accept $97 payments from those Founders holding 'free' positions as of that date, resulting in the payment of tens of millions of dollars in Founders' fees subsequent to June 22, 2022." (*Id.* ¶ 53.)

In November 2022, OnPassive "made available to the general public four applications, including the IP tracker and URL shortener, all free of charge." (*Id.* ¶ 78.)  Since then, OnPassive has "offered two additional applications . . . to the general public free of charge." (*Id.*)  "As of June 30, 2023," the remainder of the applications in OnPassive's suite "had yet to be released," and the commercial rollout of the suite

"had yet to occur." (*Id.*)

### F. 2023

As of March 2023, OnPassive had received more than $108 million from more than "800,000 investors located in the United States and abroad" who bought more than 1.12 million Founder positions. (*Id.* ¶ 14.) The SEC describes these millions of dollars as "illicit proceeds" that Defendants received "[a]s a result of" their misconduct. (*Id.* ¶ 96.) "As of June 30, 2023, [OnPassive] had not yet launched any product for a fee or paid any commissions to investors." (*Id.* ¶ 16; *accord id.* at 15 n.1.)

## PROCEDURAL HISTORY

On August 11, 2023, the SEC filed the initial complaint in this case, bringing five counts. (Dkt. 2.) The SEC brought three counts against both Mr. Mufareh and OnPassive: unregistered offers and sales of securities, in violation of 15 U.S.C. §§ 77e(a) and 77e(c) (Count I); fraud, in violation of 15 U.S.C. § 77q(a)(1)–(3) (Count II); and fraud in connection with the purchase or sale of securities, in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a)–(c) (Count III). (Dkt. 2 ¶¶ 93–103.) The SEC brought one count against Mr. Mufareh separately from OnPassive: violation, as a control person, of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a)–(c) (Count IV). (Dkt. 2 ¶¶ 104–07.) The SEC also brought a count against Mrs. Mufareh as a relief defendant for unjust enrichment pursuant to 15 U.S.C. § 78u(d)(5) (Count V). (Dkt. 2 ¶¶ 108–11.) The SEC sought four main forms of relief: (1) a permanent injunction restraining Mr. Mufareh and OnPassive from violating federal securities laws and from participating in MLM programs, (2) disgorgement of Defendants' "ill-gotten gains"

along with prejudgment interest, (3) civil money penalties, and (4) a judgment prohibiting Mr. Mufareh from serving as the officer or director of certain business entities. (*Id.* at 41–42.)

Defendants moved to dismiss the initial complaint with prejudice, arguing that it was a shotgun pleading and that Counts II, III, and V failed to state a claim. (Dkt. 20.) In response, the SEC amended its complaint. (Dkt. 26.) The amended complaint contains the same counts and requests the same relief as the initial complaint. (*Compare* Dkt. 2, *with* Dkt. 26.) Defendants now move to dismiss the amended complaint, making substantially the same arguments they made in their motion to dismiss the initial complaint. (*Compare* Dkt. 20, *with* Dkt. 32.)

## APPLICABLE STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to "contain . . . a short and plain statement of [a] claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). Federal Rule of Civil Procedure 10(b) requires the plaintiff to "state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). To "promote clarity," Rule 10(b) also requires the plaintiff to state "each claim founded on a separate transaction or occurrence . . . in a separate count." *Id.* "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). Shotgun pleadings "fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323. One type of shotgun

pleading is a complaint that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* at 1321–22.   A court may dismiss a complaint as a shotgun pleading only "where 'it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.'" *Id.* at 1325 (emphasis in original) (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).

In deciding a motion to dismiss for failure to state a claim, a court "accept[s] the allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiff." *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019).   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[D]etailed factual allegations" are generally not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).   Generally, when analyzing a motion to dismiss for failure to state a claim, a court considers only the four corners of the complaint. *See Turner v. Williams*, 65 F.4th 564, 583 n.27 (11th Cir. 2023). "However, a document outside the four corners of the complaint may . . . be considered if it is central to the plaintiff's claims and is undisputed in terms of

authenticity." *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005).[3]

A claim sounding in fraud "must state with particularity the circumstances constituting [the] fraud." Fed. R. Civ. P. 9(b).  To meet this particularity requirement, the claim must set forth "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiff[]; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997).  In other words, the claim must provide "the who, what, when[,] where, and how" of the alleged fraudulent activities. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (quoting *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1470 (N.D. Ga. 1997)).  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## ANALYSIS

Defendants argue that the amended complaint is a shotgun pleading and that Counts II, III, and V fail to state a claim. (Dkt. 32 at 12–30.)  The court first addresses the shotgun pleading argument, then examines Counts II and III together, and finally discusses Count V.

---

[3] *Maxcess* describes the incorporation-by-reference doctrine. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).  Defendants invoke this doctrine to argue that the court should consider the entirety of the February 2020 marketing message mentioned in the amended complaint. (Dkt. 32 at 22 n.11; *see* Dkt. 26 ¶ 63.)  The SEC does not dispute the message's authenticity.  (*See* Dkt. 33.) Accordingly, because the message is central to the SEC's claims, the court will consider it.  *See Meyer v. Greene*, 710 F.3d 1189, 1193 n.5 (11th Cir. 2013) (considering the entirety of a presentation described in a securities fraud complaint when reviewing the complaint's dismissal for failure to state a claim).

### 1. Shotgun Pleading

Defendants maintain that the amended complaint is a shotgun pleading because it is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." (*Id.* at 13 (quoting *Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021)).) *See Weiland*, 792 F.3d at 1321–22. Defendants reason that every count but Count I "incorporate[s] virtually all of the [amended complaint's] general factual allegations . . . and then simply state[s] the elements of the cause of action." (Dkt. 32 at 13.) Further, in Defendants' view, although the amended complaint generally alleges that Defendants' statements described in paragraphs 59, 61, and 62 were false or misleading, it does not identify those statements as bases for Counts II and III. (*Id.* at 13–14.) Defendants claim that they therefore "do not know whether" those statements "are intended to support" those counts. (*Id.* at 14.)[4]

The SEC responds that incorporating the same factual allegations in multiple counts "is proper here due to the scope of the fraudulent scheme." (Dkt. 33 at 12.) The SEC further contends that for two reasons, the amended complaint affords Defendants "more than sufficient notice" that the statements described in paragraphs 59, 61, and 62 are intended to support Counts II and III. (*Id.*) First, those counts refer to paragraphs 64 and 68 as bases, and paragraphs 64 and 68 refer to the statements in

---

[4] In the section of their motion devoted to Counts II and III, Defendants also assert that because the amended complaint is a shotgun pleading, they can only "guess" that the SEC "plans to support its claim for scheme liability with its allegation that OnPassive is a 'pyramid scheme.'" (*Id.* at 23.) The amended complaint does not require Defendants to guess. It unmistakably focuses on the OnPassive investment program, which it labels a pyramid scheme. (*See* Dkt. 26 ¶¶ 1–4, 10–12, 14, 17.) Defendants' assertion to the contrary is not persuasive.

- 16 -

paragraphs 59, 61, and 62.  (*Id.*)  Second, the counts incorporate by reference paragraphs 59, 61, and 62.  (*Id.*)

The court agrees with the SEC that the amended complaint "is not 'replete' with vague, conclusory, or immaterial facts which" are extraneous to "its causes of action or which make it difficult to decipher the basis of each claim."  *Dressler v. Equifax, Inc.*, 805 F. App'x 968, 972 (11th Cir. 2020) (quoting *Weiland*, 792 F.3d at 1322).  The amended complaint does not "make it 'virtually impossible' for each defendant to know 'which allegations of fact are intended to support which claim(s) for relief.'"  *Id.* (quoting *Weiland*, 792 F.3d at 1325); *see Inform Inc. v. Google LLC*, No. 21-13289, 2022 U.S. App. LEXIS 24107, at *12–13 (11th Cir. Aug. 26, 2022) (holding that even though a complaint was "certainly long" and was not "a paragon of clarity," it was not a shotgun pleading because its form "did not prevent the district court or . . . defendants from understanding the basis of" the claims); *see also Jean Charles v. Geo Grp. Inc.*, No. 22-13891, 2024 U.S. App. LEXIS 9021, at *6–7 (11th Cir. Apr. 15, 2024).[5]  "The problem with a shotgun pleading is that each subsequent count is replete

---

[5] In *Jean Charles*, the district court dismissed the first amended complaint as a shotgun pleading because "each of the two counts incorporated by reference every allegation of the entire pleading."  2024 U.S. App. LEXIS 9021, at *3 (internal quotation marks omitted).  The plaintiff then filed a second amended complaint that was "essentially unchanged" from the first amended complaint.  *Id.* at *3–4.  The district court dismissed the second amended complaint as a shotgun pleading, highlighting three deficiencies.  *Id.* at *4–5.  First, one count "commingled distinct transactions and occurrences."  *Id.* at *4 (internal quotation marks omitted).  Second, it was unclear whether the other count incorporated immaterial allegations given the numbering of the complaint's paragraphs.  *Id.* at *4–5.  Third, the complaint "ma[de] allegations against [the d]efendants collectively without identifying which [d]efendant was responsible for which acts or omissions."  *Id.* at *5 (internal quotation marks omitted).  The Eleventh Circuit held that "the district court abused its discretion by dismissing [the] first and second amended complaints as shotgun pleadings."  *Id.* at *6.  The Eleventh Circuit explained that "[d]espite the pleading deficiencies identified by the [district] court, it [wa]s not 'virtually impossible'

with irrelevant factual allegations and legal conclusions.  Here, the complaint simply contains . . . general factual allegations that are relevant to [almost] all of [the SEC's] claims."  *See Small v. Amgen, Inc.*, 2 F. Supp. 3d 1292, 1297 (M.D. Fla. 2014).

The court also agrees with the SEC that the amended complaint adequately informs Defendants that the statements described in paragraphs 59, 61, and 62 are intended to support Counts II and III.  Paragraph 59 states that Mr. Mufareh and OnPassive "made multiple and repeated materially misleading claims" about "the potential size of the income opportunity" that the OnPassive investment program represented.  (Dkt. 26 ¶ 59.)  Paragraph 61 concerns the payment grid that Mr. Mufareh shared during the September 25, 2018 webinar, as well as Mr. Mufareh's claims during the webinar that "the grid showed how it was possible for participants [in the OnPassive investment program] to receive over $2 million per month if up to ten tiers under them were fully populated" and that "$30 million per month was feasible if more than ten rows were populated."  (*Id.* ¶ 61.)  Paragraph 62 concerns the document that Mr. Mufareh "authoriz[ed]" asserting that "a participant could have 'an infinite team' of downstream recruits from which the participant would draw commissions and earn 'unlimited residual income' 'for life'" and that "a participant could earn thousands and even millions of dollars" through the OnPassive investment program.  (*Id.* ¶ 62.)  Paragraph 64 states that Mr. Mufareh "knew or was reckless in not knowing that the representations set forth in [p]aragraphs 59 through 63

---

to understand [the] claims or 'which allegations of fact [we]re intended to support which claim(s) for relief.'"  *Id.* at *6–7 (quoting *Weiland*, 792 F.3d at 1325).

concerning the purported income that could be earned from investing in" the OnPassive program "were factually unsupportable and materially misleading." (*Id.* ¶ 64.) Paragraph 68 states that Mr. Mufareh and OnPassive made "materially false and misleading statements" and omissions "[i]n addition to those material misrepresentations addressed in [p]aragraphs 59 through 63." (*Id.* ¶ 68.) Counts II and III discuss Mr. Mufareh and OnPassive's conduct "as alleged in" paragraphs 64 and 68, (*id.* ¶¶ 106, 109), and incorporate by reference paragraphs 59, 61, 62, 64, and 68, (*id.* ¶¶ 105, 108). The amended complaint thus puts Defendants on sufficient notice that the statements in paragraphs 59, 61, and 62 are intended to support Counts II and III. "[T]echnical exactness" is not required. *Jean Charles*, 2024 U.S. App. LEXIS 9021, at *8–9 (citing *De Loach v. Crowley's, Inc.*, 128 F.2d 378, 380 (5th Cir. 1942)).

Accordingly, the court will not dismiss the amended complaint as a shotgun pleading.

## 2. Counts II and III

The SEC brings Count II under 15 U.S.C. § 77q(a)(1)–(3) and Count III under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a)–(c). (Dkt. 26 ¶¶ 105–10.) A defendant may be liable under 15 U.S.C. §§ 77q(a) and 78j(b) and 17 C.F.R. § 240.10b-5 when he makes "deceptive contributions to an overall fraudulent scheme." *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014). For claims under 15 U.S.C. § 77q(a)(1), the SEC must plead "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter."

*SEC v. Merch. Cap., LLC*, 483 F.3d 747, 766 (11th Cir. 2007).  For claims under 15 U.S.C. § 77q(a)(2) and (a)(3), the SEC must plead "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence." *Monterosso*, 756 F.3d at 1334.  For claims under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a)–(c), the SEC must plead "(1) a material misrepresentation or materially misleading omission[,] (2) in connection with the purchase or sale of securities[,] (3) made with scienter." *Monterosso*, 756 F.3d at 1333–34.

Defendants contend that Counts II and III fail to state claims for relief for three reasons.  (Dkt. 32 at 14–28.)  First, the SEC does not adequately allege the existence of a fraudulent scheme.  (*Id.* at 23–25.)  Second, the misrepresentations and omissions asserted in the amended complaint are not actionable.  (*Id.* at 14–22.)  Third, the SEC does not sufficiently plead scienter.  (*Id.* at 25–28.)  The court disagrees on all points.

With respect to their first argument, Defendants assert that the SEC "fails to allege conduct that would render OnPassive's business inconsistent with that of a legal MLM" program and that "OnPassive's proposed business model does not meet the SEC's own definition of a 'pyramid scheme.'" (*Id.* at 23–25.)[6]  The SEC responds that

---

[6] The court takes judicial notice of the distinction between MLM programs and pyramid schemes that the SEC set forth in the September 30, 2013 investor alert *Beware of Pyramid Schemes Posing as Multi-Level Marketing Programs* found at https://www.sec.gov/oiea/investor-alerts-bulletins/investor-alerts-ia-pyramid.  (*See* Dkt. 32 at 24–25.)  *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *S.-Owners Ins. Co. v. Waterhouse Corp.*, No. 6:21-cv-504-PGB-EJK, 2022 U.S. Dist. LEXIS 245332, at *29 n.14 (M.D. Fla. July 25, 2022) ("Because the . . . information derives from an official government website, the [c]ourt may take judicial notice of [it].").  Although the investor alert provides useful advice in this area of securities law, the court does not view it as persuasive regarding whether Counts II and III state claims for relief.

its detailed allegations that Mr. Mufareh and OnPassive "offered unregistered securities in connection with an illegal pyramid scheme," "repeatedly made materially false and misleading statements and omissions to potential investors," and used "counterfeit review websites" to "pass[] off" "internally generated positive reviews" of Mr. Mufareh and OnPassive as "objective, third-party reviews" sufficiently support the existence of a fraudulent scheme. (Dkt. 33 at 19–20.) The SEC labels the OnPassive investment program "a pyramid scheme" because, according to the SEC, OnPassive "sells investors an opportunity to make money not through the sale of a product but rather in return for recruiting other investors, who are likewise incentivized to recruit others in an unending and unsustainable chain of recruitment." (*Id.* at 20.) The SEC argues that the amended complaint "specifically describ[es] the nature of the illegal pyramid scheme, including the components of the illegal business arrangement and how it was promoted to potential investors." (*Id.* (citations omitted).)

Construed in the light most favorable to the SEC, *see Henley*, 945 F.3d at 1326, the amended complaint alleges a fraudulent scheme. *See Webster v. Omnitrition Int'l*, 79 F.3d 776, 781 (9th Cir. 1996) (explaining that the "[o]peration of a pyramid scheme constitutes fraud" in the securities context because such a scheme is "inherently fraudulent"). Further, the alleged scheme is pleaded with the requisite particularity. *See* Fed. R. Civ. P. 9(b). Most of the amended complaint is devoted to describing the alleged scheme. (*See* Dkt. 26.) The amended complaint alleges how Mr. Mufareh started the program, (*e.g.*, *id.* ¶¶ 37–38), how the program changed over time, (*e.g.*, *id.*

¶ 51), how the program worked, (*e.g.*, *id.* ¶¶ 33–36, 44), the strategies Mr. Mufareh and OnPassive used and statements they made to investors in furtherance of the program, (*e.g.*, *id.* ¶¶ 45–48), the counterfeit review websites they created, (*e.g.*, *id.* ¶¶ 84–86), the special terms they used (like "Back Office" and "Founders"), (*e.g.*, *id.* ¶¶ 24–29), the amount of money that investors could purportedly receive through the program, (*e.g.*, *id.* ¶¶ 60–62), and the dates on which Mr. Mufareh and OnPassive engaged in misconduct, (*e.g.*, *id.* ¶¶ 61, 70, 73, 84, 87).   The amended complaint frequently answers the "who, what, when[,] where, and how" questions concerning the alleged scheme.  *See Garfield*, 466 F.3d at 1262.  Accordingly, the court will not dismiss Counts II and III based on Defendants' first argument.

With respect to their second argument, Defendants contend that the statements about OnPassive's legality, the timing of the product launch, and potential income opportunities are not actionable.  (Dkt. 32 at 14–22.)  The statements about OnPassive's legality, Defendants argue, are opinions requiring the SEC to allege that Mr. Mufareh did not believe in OnPassive's legality, that he supported the opinions with untrue facts, or that his omission of facts made the opinions misleading.  (*Id.* at 15–16.)  According to Defendants, the SEC does not plead what it must in this regard. (*Id.*)  Defendants further maintain that the statement "We will not be shut down by a government; they will use our products!" is inactionable puffery.  (*Id.* at 16–17.)  As to the statements about the timing of the product launch, Defendants assert that each statement is either "just [an] update[] on OnPassive's progress" that "do[es] not promise to launch products on any specific date" or an opinion the SEC fails to

"specified" the potential incomes and timeframes for investors, and the February 2020 marketing message classified income figures as "realistic," "conservative," and "worst case"—and the statements were "repeated to reassure investors." (*Id.* at 16–18.) The SEC further asserts that the disclaimers included with the statements do not defeat liability. (*Id.* at 18.)

The statements that OnPassive was fully legal and compliant worldwide, (*e.g.*, Dkt. 26 ¶ 70c), are likely statements of fact, not opinions. *See Shafer v. Glob. Payments, Inc.*, No. 1:23-cv-00577-LMM, 2024 U.S. Dist. LEXIS 97630, at *15 (N.D. Ga. Mar. 29, 2024) (finding that a "reasonable investor could interpret . . . as fact" the statement "We are currently in compliance with existing legal and regulatory requirements"); *see also Concordia Pharms., Inc. v. Winder Labs. LLC*, No. 2:16:-CV-004-RWS, 2018 U.S. Dist. LEXIS 244397, at *25 (N.D. Ga. Sept. 28, 2018) ("[The p]laintiff's statements regarding the legality of [the d]efendants' products are not mere opinions but rather discernable statements of fact."). However, even if the statements are opinions, every statement of opinion "explicitly affirms one fact: that the speaker actually holds the stated belief." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). A "statement about legal compliance . . . would falsely describe" the speaker's mental state if he actually "thought h[is] company was breaking the law," and thus, the statement "would subject the [speaker] to liability (assuming the misrepresentation were material)." *Id.* at 184–85; *see Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019). As discussed more fully below in connection with Defendants' third argument, the amended complaint sufficiently

pleads scienter.  For example, the amended complaint alleges that Mr. Mufareh and OnPassive knew that "they were operating an unlawful pyramid scheme."  (Dkt. 26 ¶ 69.)  It also alleges that they knew that the statements about the timing of the product launch were false because they knew when the statements were made that the product could not launch "within the timeframes specified" in the statements.  (*Id.* ¶ 80.)  Therefore, the statements about OnPassive's legality and the timing of the product launch are actionable even if they are opinions.  *See Omnicare*, 575 U.S. at 184.

Moreover, "a defendant can be held liable" for opinions that "do not fairly align with the information in the defendant's possession at the time the statements are made."  *SEC v. Alar*, No. 1:19-CV-03265-JPB, 2020 U.S. Dist. LEXIS 257387, at *12 (N.D. Ga. Sept. 21, 2020) (alterations adopted and internal quotation marks omitted) (quoting *Omnicare*, 575 U.S. at 189).  Given the well-pleaded facts in the amended complaint, Mr. Mufareh possessed significant information as OnPassive's CEO— including information about the counterfeit sites—that ran counter to his statements about the investment program.  The court agrees with the SEC that the failure to disclose OnPassive's involvement in those sites amounted to a material omission.  *See Shafer*, 2024 U.S. Dist. LEXIS 97630, at *15 ("[A]n opinion is also actionable if the statement 'omits material facts' that 'conflict with what a reasonable investor would take from the statement itself.'" (quoting *Omnicare*, 575 U.S. at 189)).

Regarding puffery, "when considering a motion to dismiss a securities-fraud action, a court" should not grant the motion "unless the alleged misrepresentations— puffery or otherwise—are 'so obviously unimportant to a reasonable investor that

reasonable minds could not differ on the question of their importance.'" *Carvelli*, 934 F.3d at 1320 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)). None of the challenged statements are unimportant enough to a reasonable investor to justify their dismissal as puffery at the pleading stage. Further, the statements in the payment grid and February 2020 marketing message are measurable, suggesting that they are not puffery. *See SEC v. BIH Corp.*, No. 2:10-cv-577-FtM-29DNF, 2014 U.S. Dist. LEXIS 172122, at *6 (M.D. Fla. Dec. 12, 2014) (determining that statements were not puffery because they were "verifiably false"). In addition, Defendants' use of disclaimers does not render the challenged statements inactionable. *See FTC v. Noland*, 672 F. Supp. 3d 721, 783 (D. Ariz. 2023) (concluding that "the net impression . . . that affiliates could reasonably expect to earn substantial, if not life-changing, amounts of money" was "unaffected by [the d]efendants' use of purported disclaimers" (internal quotation marks omitted)); *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1029 (N.D. Ill. 2004) ("Given the allegations that [the d]efendants knowingly omitted material information, . . . general disclaimers are not enough to save them from potential liability at this stage of the proceedings.").

With respect to their third argument, Defendants maintain that the amended complaint contains insufficient factual support for its allegations that Mr. Mufareh knew or was reckless in not knowing that the OnPassive investment program was fraudulent. (Dkt. 32 at 25–28.) Defendants assert that the amended complaint describes neither a document suggesting Mr. Mufareh's knowledge or recklessness concerning the program nor a witness showing the falsity of Mr. Mufareh's statements.

(*Id.* at 27.)  Defendants further contend that the amended complaint lacks support to show that Mr. Mufareh had motive to commit fraud because his reason for spending the funds—personal use—amounts to "nothing more than an executive taking a salary for his efforts" and is thus "insufficient to plead scienter." (*Id.* at 28.)  In response, the SEC argues that the claims raised under 15 U.S.C. § 77q(a)(2) and (a)(3) in Count II do not require scienter. (Dkt. 33 at 21 n.4.)  Regarding the remaining claims in Counts II and III, the SEC asserts that the amended complaint "demonstrate[s] knowing misconduct or, at a minimum, severe recklessness."  (*Id.* at 23.)  The amended complaint does so, according to the SEC, through its allegations that Mr. Mufareh and OnPassive made false statements about the timing of the product launch when they knew "facts inconsistent with that timing," made false statements about "the magnitude of unrealistic potential investment returns" and "the legality of the business organization," and created counterfeit review websites to publish fake reviews of OnPassive.  (*Id.* at 22.)

The claims in Count II brought under 15 U.S.C. § 77q(a)(2) and (a)(3) do not require scienter.  *See Aaron v. SEC*, 446 U.S. 680, 697 (1980); *see also Monterosso*, 756 F.3d at 1334 (requiring negligence, not scienter).  These claims will thus not be dismissed based on Defendants' third argument.  Although the other claims in Counts II and III require scienter, *see Monterosso*, 756 F.3d at 1333–34, they will not be dismissed because scienter is adequately alleged.

"Scienter may be established by a showing of knowing misconduct or severe recklessness."  *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982).  "Proof

of recklessness requires a showing that the defendant's conduct was an extreme departure of the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Monterosso*, 756 F.3d at 1335 (alterations adopted) (quoting *Carriba Air*, 681 F.2d at 1324). "Scienter can be established through circumstantial or direct evidence." *Id.* "The scienter of a [business entity] is established by showing that the [entity]'s officers or directors acted with scienter." *See ZPR Inv. Mgmt. Inc. v. SEC*, 861 F.3d 1239, 1252 (11th Cir. 2017); *SEC v. Reynolds*, No. 1:06-CV-1801-RWS, 2010 U.S. Dist. LEXIS 106822, at *12 (N.D. Ga. Oct. 5, 2010) ("[B]ecause [the individual defendant] controlled [the LLC defendant], his scienter is imputed to it."). The SEC may allege scienter generally. *See* Fed. R. Civ. P. 9(b); *SEC v. City of Miami*, 988 F. Supp. 2d 1343, 1353 (S.D. Fla. 2013) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)).

The amended complaint generally claims that Mr. Mufareh "knew or was reckless in not knowing that the operation of the [OnPassive investment program], the creation of the counterfeit websites, and the material misrepresentations and omissions collectively constituted a scheme to defraud and operated or would operate as a fraud or deceit on investors." (Dkt. 26 ¶ 90.) The amended complaint also claims that Mr. Mufareh's scienter may be imputed to OnPassive because, as the company's CEO and co-owner, he exercised "ultimate authority over all [its] operations and statements." (*Id.* ¶ 64.) To support these claims, the amended complaint alleges that Mr. Mufareh and OnPassive "knowingly and recklessly made repeated materially false and

misleading statements and omissions concerning . . . the potential income to be earned[] and the soundness and legality of [the company's] operations." (*Id.* ¶ 11; *accord id.* ¶¶ 64, 67, 69.) According to the amended complaint, Mr. Mufareh and OnPassive "falsely advertised . . . outlandish potential passive or 'residual' returns to investors that could last 'for life,'" as when Mr. Mufareh and OnPassive shared the payment grid that "purport[ed] to show"—based on an "unrealistic assumption"—"how a participant could receive up to $2,032,614 per month for life." (*Id.* ¶ 60.) The amended complaint further states that instead of using investor funds to develop OnPassive's purported suite of applications, Mr. Mufareh used them to further the investment program and to pay for his and his wife's "personal expenses, including online retail purchases, upscale dining, [television] subscriptions, groceries, salon and spa visits, and the purchase of stocks." (*Id.* ¶ 17.) These allegations support scienter. *See SEC v. Kingdom Legacy Gen. Partner, LLC*, No. 2:16-cv-441-FtM-38MRM, 2017 U.S. Dist. LEXIS 12717, at *17 (M.D. Fla. Jan. 31, 2017); *Reynolds*, 2010 U.S. Dist. LEXIS 106822, at *13 ("[The d]efendants' extremely reckless statements about . . . rates of return, levels of risk, and regulatory approval status demonstrate a high level of scienter. A finding of scienter is further supported by the fact that [the individual defendant] used investor funds for personal expenses.").

The amended complaint also alleges that Mr. Mufareh and OnPassive "made material misstatements . . . regarding the feasibility and timing of the product [l]aunch, while knowing or being reckless in not knowing that they lacked a factual basis for making the statements." (Dkt. 26 ¶ 73; *accord id.* ¶¶ 11, 80.) The amended

complaint states that Mr. Mufareh "knew or was reckless in not knowing at the time of each [mis]statement" not only "that development of applications had not yet started, let alone progressed to the point that [the] product [l]aunch could occur within the timeframes specified," but also that OnPassive "lacked the capacity to develop the applications" in those timeframes.  (*Id.* ¶ 80.)   Further, the amended complaint describes how Mr. Mufareh and OnPassive reacted to negative reviews on websites by creating counterfeit sites "mimicking the names and appearances" of those websites to decrease the websites' positions in search results, how Mr. Mufareh and OnPassive used "a 'domain proxy' to conceal [their] involvement with" the counterfeit sites, and how Mr. Mufareh and OnPassive concealed their control over the counterfeit sites and falsely presented the counterfeit sites as relying on "objective third-party . . . data" to post "fake," "internally[ ]generated[,] positive reviews" of themselves through the counterfeit sites.  (*Id.* ¶¶ 84–86.)  These allegations also support scienter.  *See SEC v. Weintraub*, No. 11-21549-CIV-HUCK/B, 2011 U.S. Dist. LEXIS 149999, at *25 (S.D. Fla. Dec. 30, 2011) ("A defendant engages in knowing misconduct when he creates documents he knows are false.").  The amended complaint sufficiently alleges Mr. Mufareh's and OnPassive's scienter.  Accordingly, the claims in Counts II and III that require scienter will not be dismissed based on Defendants' third argument.

Because Counts II and III sufficiently plead the existence of a fraudulent scheme, actionable misrepresentations and omissions, and scienter, the counts will not be dismissed for failure to state a claim.

**3.  Count V**

In Count V, the SEC sues Mrs. Mufareh as a relief defendant under the equitable theory of unjust enrichment.  (Dkt. 26 ¶¶ 114–17.)  The Securities Exchange Act of 1934 authorizes the court to grant "any equitable relief that may be appropriate or necessary for the benefit of investors" in an action brought by the SEC under the securities laws.  15 U.S.C. § 78u(d)(5).  The court may "order equitable relief against" a relief defendant where she (1) "has received ill-gotten funds" and (2) "does not have a legitimate claim to those funds."  *SEC v. Founding Partners Cap. Mgmt.*, 639 F. Supp. 2d 1291, 1293 (M.D. Fla. 2009).  "A claim of ownership is not legitimate where," for example, "the relief defendant holds the funds in trust for the primary violator, the ownership claim is a sham, [or] the relief defendant acted as a mere conduit of proceeds from the underlying statutory violation."  *U.S. Commodity Futures Trading Comm'n v. WeCorp, Inc.*, 848 F. Supp. 2d 1195, 1202 (D. Haw. 2012) (citing *SEC v. Ross*, 504 F.3d 1130, 1141–42 (9th Cir. 2007)).  In contrast, a relief defendant "has presumptive title to" compensation that she receives "in return for services rendered."  *Ross*, 504 F.3d at 1142.

Defendants contend that Count V does not state a claim for unjust enrichment against Mrs. Mufareh because it does not "plead facts to support its conclusory allegation that she does not have a legitimate claim" to the funds that she received as a co-founder and co-owner of OnPassive.  (Dkt. 32 at 29 (internal quotation marks omitted).)  "There are no allegations," Defendants argue, "that [Mrs. Mufareh] received anything other than routine compensation to a founder or a dividend to an owner."  (*Id.*)  The SEC responds that Count V "adequately alleges that [Mrs.

Mufareh] had no legitimate claim to the funds she received," mainly because she allegedly "gave no consideration in exchange for the funds." (Dkt. 33 at 23–24 (internal quotation marks omitted).)

The amended complaint does not allege that Mrs. Mufareh received compensation as a co-founder and co-owner of OnPassive or that she rendered any services warranting compensation. (*See* Dkt. 26.) Instead, it alleges that she "gave no consideration" for the funds that she received. (*Id.* ¶ 116.) Moreover, it alleges that Mr. Mufareh, as OnPassive's CEO, "wholly controlled all" of the company's operations and "had ultimate authority over its activities, including" all alleged securities violations. (*Id.* ¶ 21.) The amended complaint focuses on Mr. Mufareh's actions on OnPassive's behalf, using the word "Mufareh" to refer to Mr. Mufareh and the word "Defendants" to refer to Mr. Mufareh and OnPassive. (*Id.* at 1.) In contrast, the amended complaint refers to Mrs. Mufareh by her full name and uses the term "Relief Defendant" to describe her. (*Id.*) The amended complaint recounts numerous actions that Mr. Mufareh and OnPassive allegedly undertook, (*e.g.*, *id.* ¶¶ 2–3, 5–9, 11–12, 15–17), but with respect to Mrs. Mufareh's actions, it states only that she received "investors' funds" from her husband, "exercised authority" over accounts that contained the funds, converted some of the funds to cryptocurrency, and "used funds . . . for personal expenses, including online retail purchases, upscale dining, [television] subscriptions, groceries, salon and spa visits, and the purchase of stocks," (*id.* ¶¶ 17, 23, 97–99, 116–17). Although the amended complaint also states that in July 2018, Mr. and Mrs. Mufareh "were the only two persons involved with any aspect

of [OnPassive]'s operations," it does so while alleging that "neither [Mr. nor Mrs. Mufareh] had any expertise to develop a suite of computer applications using AI." (*Id.* ¶ 75.)  The point of this statement is not that Mrs. Mufareh was involved to a significant extent in OnPassive's operations but that no one was developing OnPassive's suite in July 2018. (*See id.*)  Construed in the light most favorable to the SEC, *see Henley*, 945 F.3d at 1326, the statement indicates that Mrs. Mufareh was not performing work for OnPassive because she allegedly lacked the expertise to develop the suite.

Given the well-supported allegations that Mr. Mufareh acted as OnPassive's CEO and Mrs. Mufareh merely received funds from her husband and used them for personal expenses, the amended complaint adequately pleads that Mrs. Mufareh "acted as a mere conduit of proceeds from the underlying statutory violation[s]" allegedly committed by Mr. Mufareh and OnPassive. *See WeCorp*, 848 F. Supp. 2d at 1202.  Accordingly, the court will not dismiss Count V for failure to state a claim.

## CONCLUSION

Accordingly:

1.     Defendants' motion to dismiss (Dkt. 32) is **DENIED**.

2.     Defendants shall respond to the amended complaint (Dkt. 26) in accordance with Federal Rule of Civil Procedure 12(a)(4)(A).

**ORDERED** in Orlando, Florida, on August 27, 2024.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record